IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTER FOR POPULAR DEMOCRACY ACTION and CITY of NEWBURGH, | |
| *Plaintiffs*, | Case No. |
| v. | |
| BUREAU OF THE CENSUS; STEVEN DILLINGHAM, Director, Bureau of the Census; UNITED STATES DEPARTMENT OF COMMERCE; and WILBUR ROSS, Secretary of Commerce, | **COMPLAINT** |
| *Defendants.* | |

Article I, Section 2 of the United States Constitution requires the federal government to conduct an "actual Enumeration" of all residents every ten years. Sufficient staffing, funding, and preparation are essential to such a monumental undertaking. Yet the government's Final Operational Plan for the 2020 Census drastically and arbitrarily reduces the necessary resources for key activities. The Bureau has made especially irrational changes to its programs for counting African-American, Latino, and other members of what Defendants label "hard-to-count" communities.

Among the irrational decisions in the Final Operational Plan are sharp reductions in nearly every aspect of Defendants' field operations. Defendants will hire only one-third the number of enumerators employed in 2010, when the population was smaller and trust in government, as measured by Defendants' own research, was higher; will open only half as many field offices as in 2010; will eliminate fixed-point Questionnaire Assistance

Centers entirely; and will slash investment in community partnership programs, advertising, and outreach relative to 2010. These decisions are not supported by reason. They will inevitably cause a massive and differential undercount of communities of color. New York City, where Plaintiff Center for Popular Democracy Action is located, and the City of Newburgh, in the lower Hudson Valley, are home to hard-to-count populations. Differential undercounts in these communities will dilute the political representation of racial and ethnic minorities and deprive them of critical federal funds.

In the past, federal officials have made considerable efforts to enumerate "hard-to-count" populations, including African Americans, Latinos, English-language learners, and young people. These efforts reflect the recognition that an inaccurate census hurts some communities more than others. In preparing for the 2020 Census, however, the government has shirked this responsibility. Defendants have been operating on the cheap, refusing to expend even a portion of more than $1 billion in appropriated funds they now hold in reserve, despite congressional direction to spend funds on discrete activities to avoid a differential undercount.

Defendants' actions violate the Constitution and the Administrative Procedure Act. Defendants' choices in the Final Operation Plan to eliminate and slash programming aimed at ameliorating a differential undercount violate the prohibition on arbitrary and capricious agency action. Further, the Bureau's preparations for the 2020 Census are so deficient as to violate Defendants' constitutional duty to conduct an "actual Enumeration."

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Article III of the U.S. Constitution.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e) because Plaintiff City of Newburgh is a municipality located in the Southern District of New York. The events or omissions giving rise to the claim occurred in this district and no real property is involved in the action.

## PARTIES

3.     Plaintiff Center for Popular Democracy Action ("CPD Action") is a § 501(c)(4) non-profit. It works to "expand the voice and power of workers, communities of color, and immigrants on issues of economic and racial justice." CPD Action is headquartered in Brooklyn, New York, and has several hundred individual members and twelve affiliates nationwide. Individual members sign a membership card and make an annual financial contribution or vote in CPD Action's annual policy survey. Affiliates sign a resolution agreeing to affiliate with and contribute dues to CPD Action. Together, CPD Action's affiliates have more than 147,000 members. CPD Action and its affiliates promote the accuracy of the census by conducting outreach to community members.

4.     Plaintiff City of Newburgh ("Newburgh") is a municipal corporation located in the Southern District of New York. Newburgh is home to large Hispanic American, African American, and undocumented populations, making it a hard-to-count community for the 2020 Census. In 2010, a mere 57 percent of Newburgh's residents responded to the initial census questionnaire, one of the lowest census-participation rates in New York State.

5.     Defendant the Bureau of the Census (the "Bureau") is the agency within the United States Department of Commerce that oversees and implements the decennial census. The Bureau is headquartered and maintains its principal offices in Suitland, Maryland.

6.     Defendant Steven Dillingham is the Director of the Bureau, which is charged with completing the decennial census. He is sued in his official capacity.

7.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is responsible for planning, designing, and implementing the 2020 Census.

8.     Defendant Secretary Wilbur Ross, as Secretary of the U.S. Department of Commerce, oversees all operations of the Department of Commerce, including the operations of the Bureau. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

9.     Article I, Section 2 of the Constitution requires the federal government to conduct an "actual Enumeration" of every resident of the United States every ten years.

10.    In carrying out that obligation, Congress has traditionally played an active role in supervising the Bureau's conduct of the census by, among other things, issuing directives pursuant to the Census Act and enacting related appropriations legislation.

11.    The federal government uses census data to allocate hundreds of billions of dollars in public funding. These funds considerably impact state and local governments' and other public entities' ability to provide high quality education, health care, housing, transportation, and other vital services.

12. Census data is also used for seat apportionment in the U.S. House of Representatives, drawing boundaries for congressional districts and many state legislative districts, and voting rights enforcement.

13. New York uses census data for purposes of state legislative districting. Newburgh uses census data for purposes of ward boundary districting.

### History and Background of the Census

14. Since 1790, the government has conducted a decennial census in accordance with the Constitution. The drafters of the Constitution "knew that the calculation of populations could be and often were skewed for political or financial purposes," *Utah v. Evans*, 536 U.S. 452, 500 (2002) (Thomas, J., concurring in part and dissenting in part), and therefore sought to insulate the count from politics.

15. In 1954, Congress passed the Census Act which consolidated all census-related statutes in Title 13. While Congress has delegated responsibilities to the Bureau, it has also explicitly retained power and circumscribed the Bureau's discretion in key areas. With this balance in mind, courts have historically adjudicated lawsuits challenging census operations under the Administrative Procedure Act (APA)—which ensures proper balance between the executive and legislative branches—and the Constitution.

16. Beyond the authorizing statute, Congress continues to speak through its appropriations statutes and accompanying committee and conference reports, which often contain directives to the agency.

17. For example, for at least the last three decades, Congress has tasked the Bureau with reducing the differential undercount for "individuals who have historically been undercounted." Dep'ts of Commerce, Justice, & State, the Judiciary, & Related

Agencies Appropriations Act, Pub. L. No, 105-119, § 209(a)(9), 111 Stat. 2440, 2481 (1997). The Bureau has thus historically spent congressionally allocated funds to reach hard-to-count communities.

## Recent Efforts to Promote an Accurate Census

18.      The Bureau has identified what it terms "hard-to-count" populations. These include racial and ethnic minorities, English-language learners, lower income people, the homeless, undocumented immigrants, young and mobile people, children, LGBTQ individuals, and "persons who are angry at and/or distrust the government."

19.      In 2010, substantial expenditures led to the most accurate census in decades in terms of the overall population, with a net overcount of 0.01 percent, as compared to an overcount of 0.49 percent in 2000 and undercount of 1.61 percent in 1990, according to an official government post-census survey.

20.      However, for hard-to-count communities, the 2010 Census had a net undercount of 1.5 percent of Hispanic Americans and 2.1 percent of African Americans, according to an official government post-census study.

21.      The 2010 Census failed to count an estimated 1.5 million black and Hispanic residents, which would be enough people to fill two Congressional districts.

22.      The census has also undercounted other populations. In 2010, for example, home renters were undercounted by 1.1 percent and children under the age of five were undercounted by 4.6 percent.

23.      By contrast, in 2010, the net overcount was 0.6 percent for homeowners and 0.8 percent for non-Hispanic whites.

24.     The inequality in net undercounts across different subpopulations of the United States, known as the "differential undercount," inevitably has enormous consequences for the distribution of political power and economic resources.

25.     In order to ameliorate differential undercounts, in 2010 and earlier censuses the Bureau focused resources on programs designed to reach hard-to-count communities. These key programs include advertising, communications, and partnership campaigns directed at traditionally undercounted populations; questionnaire assistance operations; and large staffs of enumerators who knock on doors to conduct Nonresponse Follow-up operations. These efforts have not eliminated differential undercounts entirely, but they have reduced them, preventing even more dramatic losses of political representation and funding to hard-to-count communities.

**Imminent Risk of a Constitutionally and Statutorily Deficient 2020 Census**

26.     Defendants' preparations for the 2020 Census are so deficient as to raise imminent concerns of an undercount that is both substantially greater than in past years and entirely foreseeable, particularly affecting hard-to-count populations.

27.     The deficiencies in the 2020 Census preparations are not simply the result of a choice of methodology. Rather, they are a result of arbitrary, capricious, and unreasoned agency decisions that are all the more dangerous because of their dependence on new and untested technology.

28.     Throughout the lead up to 2020, Defendants failed to establish the typical pace of funding, staffing, and preparation at this stage of a census cycle. Moreover, Defendants have decided to make a number of dramatic technological changes for the 2020

Census, including relying on a largely-untested online response system. These sweeping changes have not been accompanied by sufficient testing.

29.     Defendants cancelled crucial field tests of census operating procedures in both 2017 and 2018. In 2017, they cancelled field tests in Puerto Rico, North Dakota, South Dakota, and Washington State. Defendants also cancelled two of three sites for the 2018 End-to-End Census Test, dress rehearsals that serve as the basis for many final decisions about decennial census methods and operations. Additionally, Defendants truncated the one remaining 2018 End-to-End testing site, removing advertising and partnerships, as well as the coverage measurement operation that helps measure how many residents are missed.

30.     Earlier this year, the Bureau moved from the planning stage of the 2020 Census to the operational stage. This transition was marked by the Bureau's publication of the final version of the 2020 Census Operational Plan on February 1, 2019.

31.     The Final Operational Plan, by its own description, "documents the design for conducting the 2020 Census" and "describ[es] design concepts and their rationale."

32.     The Bureau has explained that the Final Operational Plan "reflects [the] final design" for the 2020 Census.

33.     The 2020 Census is at imminent risk of severely and differentially undercounting people of color. This risk is caused by the Bureau's refusal to expend appropriated funds and by unlawful agency decisions set forth in the Final Operational Plan.

34.     Given the size and scope of the decennial census, immediate relief is necessary to ensure that Defendants have ample opportunity to implement the changes required to ensure a constitutionally sufficient census.

### *Irrational Design Choices in Final Operational Plan*

35.     The Bureau's Final Operational Plan includes serious design defects that will produce a more dramatic undercount of hard-to-count populations than in previous censuses. This egregious differential undercount could be readily avoided absent Defendants' arbitrary and irrational design choices.

36.     These arbitrary and irrational design choices include a (a) plan to hire an unreasonably small number of enumerators; (b) drastic reduction in the number of Bureau field offices; (c) significant reduction in the Bureau's communications and partnership program, including the elimination of local, physical Questionnaire Assistance Centers; (d) decision to replace most In-Field Address Canvassing with In-Office Address Canvassing; and (e) decision to make only limited efforts to count inhabitants of units that appear vacant or nonexistent based on unreliable administrative records.

37.     Individually and collectively, these five decisions demonstrate an abandonment of the Bureau's congressionally designated goal of reaching hard-to-count communities in the 2020 Census.

### *Insufficient Hiring of Enumerators*

38.     In every modern decennial census, one of the most important operations is Non-Response Follow-up ("NRFU"), the Bureau's process of attempting to count those who do not self-respond to the census. NRFU is conducted principally by field workers called enumerators, who physically visit housing units from which no self-response was received.

39.     Because hard-to-count populations historically self-respond at much lower rates than the general population, an adequate number of enumerators is essential for reducing the differential undercount.

40.     The Final Operational Plan announced a decision to hire drastically fewer enumerators than the Bureau hired for the 2010 Census.

41.     In fact, the Bureau has made a final decision to hire more than ***two hundred thousand fewer*** enumerators than it hired for the 2010 Census. This will reduce the number of enumerators by one-third compared to 2010, even though the total U.S. population has grown by nearly 6 percent since 2010.

42.     Of this drastically reduced number of enumerators, the Bureau plans to actually deploy in the field an even smaller number, relying only on approximately 250,000 "core enumerators."

43.     In deciding to hire a drastically reduced number of enumerators for the 2020 Census, Defendants failed to consider how this decision would impact the differential undercount and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

44.     The decision to hire a drastically reduced number of enumerators will exacerbate both the absolute undercount and the differential undercount of Plaintiffs, their members and residents, and communities geographically close to Plaintiffs.

45.     The Bureau states in the Final Operational Plan that it needs fewer enumerators for the 2020 Census than it did for the 2010 Census because each enumerator will be, on average, more productive than in 2010, and the NRFU workload will be reduced to a level that the Bureau's reduced staff of enumerators can handle.

46.     Neither of these premises is rationally justified in the Final Operational Plan, and both are unreasonable.

47.     The Bureau claims that the average productivity per enumerator will be unprecedentedly high in 2020 because the Bureau will use new technology and new protocols. The Bureau's prediction about enumerator productivity in the 2020 Census cannot be verified because its new technology and protocols have been only partially tested in a single dress rehearsal. This dress rehearsal was conducted at a single site, Providence, Rhode Island, which is not representative of the many different types of communities the census must count and not a reliable proxy for the nation as a whole.

48.     Furthermore, the results of the dress rehearsal had a self-response rate of just 52.3%, far lower than the 60.5% currently assumed by the Bureau.

49.     Even if enumerators in the 2020 Census complete as many cases per hour as the Bureau reports that enumerators did in the 2018 End-to-End Test, there will be far too few enumerators to conduct an actual enumeration in the 2020 Census.

50.     The Bureau's stated beliefs about the size of the NRFU workload are also irrational and fail to account for factors that will increase the size of the NRFU workload.

51.     Specifically, the Bureau (a) fails to account for the Bureau's own recent research findings that show there will be a low self-response rate; (b) irrationally assumes that soliciting online census responses will increase, rather than decrease, the self-response rate; and (c) assumes without evidence that the Bureau will be able reduce the NRFU workload significantly by enumerating households based on administrative records.

*The Bureau's Research Contradicts Its Assumptions About NRFU Workload*

52.     On January 24, 2019, the Bureau published the 2020 Census Barriers, Attitudes and Motivators Study Survey Report ("2020 CBAMS Survey Report") and the 2020 Census Barriers, Attitudes and Motivators Study Focus Group Final Report ("2020 CBAMS Focus Group Final Report"). The two documents together record the results of the 2020 Census Barriers, Attitudes and Motivators Study ("2020 CBAMS").

53.     According to the 2020 CBAMS Survey Report, only 67 percent of householders who participated in the 2020 CBAMS Survey reported that they were "extremely likely" or "very likely" to fill out a census form. This is an exceptionally low percentage and twenty percentage points *lower* than in 2010.

54.     The actual self-response rate in the 2020 Census will be lower than 67 percent because, as the 2020 CBAMS Survey Report points out, "past research suggests that even individuals who report a commitment to participate may not follow through on their intention."

55.     In the 2010 Census, 86 percent of 2010 CBAMS participants said they would "definitely" or "probably" respond to the 2010 Census, and the actual self-response rate was 76 percent.

56.     The 2020 CBAMS Survey Report also shows that the self-response rate will be significantly lower for households of color than for white households.

57.     In making a final decision to hire significantly fewer enumerators for the 2020 Census, the Bureau has failed to account for and draw rational conclusions from the results of the 2020 CBAMS.

*Reliance on Internet Self-Response Cannot Justify Reduced Enumerator Hiring*

58.     The 2020 Census will be the first to attempt to collect a large proportion of census responses online. The introduction of Internet Self-Response (ISR) is a radical departure from the paper and in-person methods used in all previous censuses.

59.     The 2010 Census delivered approximately 360 million paper questionnaires to 133 million housing units.

60.     This cycle, Defendants intend to encourage self-response primarily by internet and to reduce the number of in-person visits to households that do not self-respond.

61.     In 2020, Defendants will divide the United States population into cohorts.

62.      Defendants will mail census questionnaires initially to only 20 percent of those cohorts.

63.     Defendants will mail the remaining 80 percent of cohorts, comprising the majority of all housing units, a notification inviting them to complete the census questionnaire online. If these cohorts do not complete the questionnaire online or by telephone, Defendants plan to mail a paper version.

64.     The Bureau concluded in the Final Operational Plan that the introduction of ISR will cause an increase in the overall self-response rate, including a "[p]otential increase in self-response from traditional hard-to-count populations."

65.     The Bureau aims to achieve this increase in self-response by persuading 45 percent of households to self-respond through ISR in the 2020 Census.

66.     The Bureau's aspirational 45 percent ISR rate is arbitrary and capricious and not supported by substantial evidence.

67.    In the End-to-End Census Test in 2018, only 32.6 percent of households self-responded through ISR.

68.    The response rate will be even lower among hard-to-count populations, who are by definition the populations least likely to self-respond in the first place and may have reduced access to or trust in internet-based systems.

69.    The "digital divide" in the United States is stark. Only half of households earning incomes less than $30,000 per year have access to broadband internet. In more than half of the city's census tracts, approximately forty percent of residents had either no internet at home or only dial-up between 2013 to 2017.

70.    In addition, many rural residents have significantly reduced access to the internet.

71.    Communities of color, including African Americans and Hispanic Americans, are less likely to have access to internet than their white counterparts.

72.    The introduction of ISR will cause a significant number of households not to self-respond to the 2020 Census because of public concern about the Bureau's ability to protect census responses from data breaches.

73.    The Bureau has not explained in detail how it will protect the personal information of hundreds of millions of Americans and respond to the cybersecurity concerns ISR presents.

74.    Even if the Bureau is actually able to protect data about responding households, perceived data insecurity will dissuade responses, especially in light of recent high-profile and large-scale data breaches including of the Office of Personnel Management in 2015 and for clients of Equifax, Yahoo!, and Uber, among others.

14

75.     Moreover, the Bureau's cancellation of planned tests deprives it of comprehensive opportunities to test critical cybersecurity infrastructure. The absence of adequate testing of the Bureau's cybersecurity infrastructure will contribute to the public's fear of responding to the census online.

76.     Contrary to the Bureau's conclusion that ISR will cause a net increase in the overall self-response rate, ISR creates an imminent risk of a net decrease in the overall self-response rate, which will likely be more pronounced among communities of color. This will lead to a larger NRFU workload and a corresponding need for more enumerators.

77.     In formulating its final decision to hire a significantly reduced staff of enumerators for the 2020 Census, the Bureau failed to account for and draw rational conclusions from evidence that ISR will deter self-response and fail to elicit responses from hard-to-count populations, and data showing that ISR rates in tests have fallen far short of the Bureau's aspirational ISR rate.

*Administrative Record Use Cannot Justify Reduced Enumerator Hiring*

78.     Another premise underlying the Bureau's decision to hire a significantly reduced staff of enumerators is the Bureau's prediction that it will be able to enumerate a significant number of households based on federal administrative records.

79.     Under the Final Operational Plan, the Bureau will attempt to use federal administrative records to enumerate any nonresponding household that has not been enumerated after a single NRFU visit, although nonresponding households will also receive a postcard asking them to self-respond.

80.    The Final Operational Plan states that a nonresponding household will be enumerated through administrative records if and only if "the Census Bureau has high-quality administrative records from trusted sources" on that household.

81.    The Final Operational Plan lists three "[e]xamples" of trusted sources of administrative records: Internal Revenue Service ("IRS") Individual Tax Returns, IRS Information Returns, and the Center for Medicare and Medicaid Statistics Medicare Enrollment Database.

82.    The Bureau has not sufficiently tested its current plan to enumerate households based on federal administrative records and therefore lacks evidence that this method will substantially reduce the NRFU workload.

83.    Administrative-record-based enumerations will not, in fact, substantially reduce the NRFU workload.

84.    Hard-to-count populations, who will make up a disproportionately large part of the NRFU workload in the 2020 Census, are underrepresented in sources of federal administrative data like IRS Individual Tax Returns, IRS Information Returns, and the Center for Medicare and Medicaid Statistics Medicare Enrollment Database.

85.    In finally determining to hire a significantly reduced staff of enumerators, the Bureau unreasonably relied on its untested and implausible theory that administrative-record-based enumerations will substantially reduce the NRFU workload.

*Insufficient Network of Area Census Offices*

86.    For each decennial census, the Bureau opens temporary field offices around the country. The Bureau opened 494 local census offices and one area office for the 2010 Census.

16

87.     Under the Final Operational Plan, the Bureau plans to replace those 495 offices with just 248 area census offices ("ACOs") for the 2020 Census.

88.     Despite its status as one of the hardest to count localities in the state, the City of Newburgh does not have an ACO for the 2020 Census.

89.     In deciding to drastically reduce the number of field offices, Defendants failed to consider how this decision would affect the differential undercount and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

90.     The final decision to drastically reduce number of field offices will worsen both the absolute undercount and the differential undercount of Plaintiffs, their members and residents, and communities geographically close to Plaintiffs.

91.      Opening a sufficient number of ACOs is essential for an accurate 2020 Census because the ACOs will play critical roles in recruiting, hiring, training, and supervising field staff for address canvassing and NRFU.

92.     If the Bureau has too few ACOs, it will not be able to hire and train a staff of enumerators capable of conducting an actual enumeration of households that do not self-respond to the 2020 Census, nor will it be able to hire and train a staff of listers capable of performing address canvassing accurately. As a result, households—disproportionately from the hard-to-count populations that are overrepresented in the NRFU workload—will go uncounted.

93.     Having too few ACOs will also constrain the Bureau's ability to identify and address any problems that arise during address canvassing and NRFU. It is especially important for the Bureau to have this ability during the 2020 Census because the Bureau is implementing many new methods and technologies that have not been adequately tested.

94.     The number of ACOs that the Bureau has decided to open for the 2020 Census is insufficient and not rationally explained by the Bureau's stated rationale.

95.     The Bureau has stated that its final decision on the number of ACOs to open for the 2020 Census is based on the number of enumerators needed for field operations.

96.     However, the anticipated number of enumerators cannot be the basis for the number of ACOs the Bureau has decided to open, because the Bureau has substantially revised its projected number of enumerators without making a corresponding change to the planned number of ACOs.

97.     The Bureau initially planned to open 248 ACOs based on a then-current estimate that the 2020 Census would need 173,021 "core enumerators." The Bureau assumed that each ACO would have 49 field supervisors, each overseeing 15 enumerators, for a total of 735 enumerators per ACO.

98.     In 2017, the Bureau increased the projected number of core enumerators to 256,336. To maintain its enumerator-to-ACO ratio, the Bureau would need 349 ACOs.

99.     Instead of adding ACOs, however, the Bureau has made a final decision to open 248 ACOs, resulting in a much higher enumerator-to-ACO ratio than planned.

100.     In a report released in April 2018, the U.S. Department of Commerce Office of Inspector General stated that it "found no evidence that the Bureau reconciled the increased NRFU workload and associated increase in the number of enumerators with" the assumptions underlying the original plan to open 248 ACOs.

101.     To the extent that the Bureau now claims to have a reasoned basis for its new enumerator-to-ACO ratio, that rationale has been reverse-engineered and does not represent the Bureau's real reasons for failing to open more than 248 ACOs.

*Insufficient Communications and Partnership Program Staffing*

102.    Hiring partnership staff is a crucial component of the modern decennial census. Partnership staff work with local organizations and conduct targeted community outreach to encourage hard-to-count populations to complete the census.

103.    Despite the importance of the partnership program for reaching hard-to-count populations, the growth in population since 2010, heightened distrust of government, and other increased challenges for reaching these populations for the 2020 Census, the Bureau has decided to decrease its partnership program from 2010 to 2020.

104.    According to Bureau planning documents, the Bureau will hire twice as many partnership specialists for the 2020 Census (1,501) as it did for the 2010 Census (849). But this figure is misleading because it omits other key outreach staff. For the 2010 Census, for example, the Bureau hired 2,000 partnership assistants to assist the specialists; for the 2020 Census, the Bureau will hire none (0).

105.    In the lead up to 2020, the Bureau has struggled to hire and retain even its reduced number of planned partnership staff due to underfunding and a tighter labor market than existed prior to the 2010 Census.

106.    The decreased prioritization of partnership staff is especially irrational given the low self-response rates found in the 2020 CBAMS Report. That Report also found that many people were unfamiliar with the census, that there was persistent lack of knowledge about the census's purpose and process, and that knowledge about the census was spread unevenly across demographic groups.

107.    The communications program will be less effective than in 2010, for three reasons.  First, given the significant cut to the partnership program, more spending is

required to inform hard-to-count communities about the Census just to match 2010 levels of awareness.  Second, given the current climate of distrust of government, hard-to-count communities will be even more skeptical and hesitant to respond than in previous censuses and will require increased communications to assuage their concerns. Third, given that 2020 is a presidential election year, advertising will cost more as campaigns compete with the Bureau and for-profit advertisers for advertising space

108.    The Bureau's 2020 Census Detailed Operational Plan for NRFU identifies "Factors that Could Increase the NRFU Workload in the 2020 Census" and explains that "[w]hile concerted efforts are being taken to reduce the cost of NRFU and overall workload, several factors cannot be controlled." The first factor the Bureau lists is "[l]ow self-response rates." This is an inaccurate and irrational assessment. The Bureau can influence and control the likelihood of low self-response rates by increasing communications and partnership activities.

109.    Given the enormous barriers to census participation among hard-to-count communities this cycle, the Bureau's decision to reduce its partnership staffing is unreasonable and will contribute to a severe and differential undercount.

110.    In deciding to reduce overall staffing of the partnership program, Defendants failed to consider the consequences for a differential undercount and rationally to analyze evidence about how this decision would affect the absolute undercount.

111.    The decision to reduce overall staffing of the partnership program will worsen both the absolute undercount and the differential undercount of Plaintiffs, their members and residents, and communities geographically close to Plaintiffs.

*Elimination of Local Questionnaire Assistance Centers*

112.     During the 2010 Census, the Bureau addressed the problem of individuals who did not receive or complete a questionnaire in the mail or receive an in-person interview, by establishing 29,157 staffed Questionnaire Assistance Centers ("QACs") and 9,670 unstaffed Be Counted ("BC") sites.

113.     760,748 people were counted in 2010 through the QACs and BCs. Of those who visited a stateside QAC, over 38 percent said they had not received a questionnaire in the mail, suggesting that their housing units were not included in the Bureau's Master Address File (MAF).

114.     The Bureau has nevertheless eliminated these nearly 40,000 sites and plans to replace them with mobile questionnaire assistance, which are mobile response units staffed with Census Bureau employees to assist respondents in filling out the forms online. In 2010, 65 percent of people who used a QAC reported that they learned of the QAC by seeing it in person. It is therefore unreasonable to expect that people left out of the MAF will use a mobile-based system.

115.     These decisions will further exacerbate and compound the differential undercount during the Census. They will particularly harm communities — such as those living in atypical housing units — that are likely to be left out of the MAF.  Indeed, the U.S. House of Representatives Committee on Oversight and Reform questioned the decision to cut QACs despite having over a billion dollars of unspent funds is unreasonable.

116.     The refusal to establish QACs will have a direct effect on Plaintiffs and their communities. Plaintiff Newburgh does not have a local QAC for the 2020 Census, despite Senator Charles Schumer, Senator Kirsten Gillibrand, and Representative Sean Maloney

urging the Bureau to establish a QAC in Newburgh using a small portion of the appropriated funds which the Bureau has refused to spend.

*Elimination of Most In-Field Address Canvassing*

117.    Address canvassing operations allow the Bureau to establish the universe of housing units to be counted. A comprehensive and correct address list is necessary to ensure the inclusion of all housing units for mailings and enumerator visits.

118.    The Bureau keeps a database of housing units in the Master Address File/Topologically Integrated Geographic Encoding and Referencing ("MAF/TIGER") System.

119.    In past censuses, temporary Bureau employees called "listers" walked nearly every block and identified each living quarters' status before making address changes in the MAF.

120.    In the lead-up to 2020, the Bureau has departed from this past practice to save costs. Instead, it decided to conduct a majority of address canvassing solely in-office. This process began in September 2015 and will be completed in 2020.

121.    The In-Office Address Canvassing process includes multiple components. First, the Bureau updates and validates its existing address list using external information sources. Bureau employees also review satellite imagery of blocks to see whether the number of living quarters is likely to deviate from its address lists. Blocks where deviations are likely are marked for In-Field Address Canvassing operations.

122.    The Bureau planned to conduct an in-office follow-up process called Active Block Resolution ("ABR") to review and update blocks previously identified as having a changed number of addresses based on imagery review and comparison with the MAF.

123.     The Bureau suspended this program in 2017. The MAF Coverage Study, which was intended to assess In-Office Address Canvassing and provide continuous updates, was also paused in 2017 purportedly due to funding considerations.

124.     The Bureau initially claimed that In-Office Address Canvassing would reduce the share of In-Field Address Canvassing to 25 percent. However, the Final Operational Plan now states that the Bureau will use In-Field Address Canvassing for 38 percent of addresses.

125.     In deciding to conduct the majority of canvassing with In-Office Address Canvassing, rather than In-Field Address Canvassing, Defendants failed to consider how this decision would affect the differential undercount, and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

126.     The decision to conduct the majority of canvassing with In-Office Address Canvassing, rather than In-Field Address Canvassing, will worsen both the absolute undercount and the differential undercount of Plaintiffs, their members and residents, and communities geographically close to Plaintiffs.

127.     The Bureau knew or should have known that heavy reliance on In-Office Address Canvassing would undermine the accuracy of the address list for the 2020 Census and increase burdens for In-Field Address Canvassers.

128.     The Office of Inspector General's audit of the 2018 End-to-End Test in Providence, Rhode Island found that "[i]n-office address canvassing did not correctly identify blocks for in-field address canvassing." The audit found that in 61 percent of the 433 passive blocks in the 2018 End-to-End Test, in-field and in-office results differed. Within those blocks, 1,287 housing units were deleted in-field and 1,087 were added.

129.   Two previous tests of In-Office Address Canvassing results also demonstrated higher error rates than anticipated. However, the Bureau has not determined why such errors occurred.

130.   Even the Operational Plan acknowledges "that some higher levels of government" may "believe an In-Field ADC may yield a greater 'quality' canvassing than In-Office ADC."

131.   The Bureau has not sufficiently analyzed or sought to correct the source of in-office categorization errors, and no additional analysis is planned. Further, the suspension of ABR and the MAF Coverage Study has limited opportunities to assess and improve the quality of In-Office Address Canvassing.

132.   The Bureau's disregard for the risk that In-Office Address Canvassing will harm address list quality means that households will be improperly excluded from the address universe of the 2020 Census and go uncounted. The Bureau has also not adequately analyzed or addressed the impact of miscategorization at the in-office level on different demographic groups.

*Use of Unreliable Data to Deprive Households of Full NRFU Efforts*

133.   To scale back its NRFU workload, the Bureau has decided to supplant in-person contacts to certain housing units with the use of administrative records.

134.   Based primarily on United States Postal Service Undeliverable-As-Addressed ("UAA") information, the Bureau will identify vacant and nonexistent housing units among those which do not initially self-respond to the census questionnaire.  Those households will be exempt from the full NRFU protocol in favor of a single field visit to determine whether the address is actually occupied.

135.    Addresses deemed unoccupied on the basis of that single NRFU contact will not be contacted subsequently.

136.    Addresses will be deemed unoccupied where the contact attempt is unsuccessful and both UAA information and other federal administrative records indicate that the address is vacant or nonexistent.

137.    The Final Operational Plan provides no adequate rationale as to the sufficiency of this method.

138.    Moreover, those addresses believed to be occupied upon the first unsuccessful contact will nonetheless be counted via federal administrative records, if available, and no further contacts will be attempted.

139.    The Bureau knew or should have known that the UAA information is a highly inaccurate predictor of vacant and nonexistent housing units.

140.    The Bureau's own field testing indicated that 18 percent of housing units identified as vacant by administrative records and 30 percent of those identified as nonexistent were in fact occupied. The Bureau has failed to consider other, more effective options for addressing the problems identified through testing.

141.    The Bureau cannot show a rational connection between the introduction of administrative-record-based enumeration and the purported reduced need for enumerators and NRFU contacts.

142.    In deciding to use administrative records to reduce the maximum number of NRFU contacts for certain housing units, Defendants failed to consider how this decision would affect the differential undercount, and failed to rationally analyze evidence about how this decision would affect the absolute undercount.

143.    The final decision to use administrative records to reduce the maximum number of NRFU contacts for certain housing units will worsen both the absolute undercount and the differential undercount of Plaintiffs, their members and residents, and communities geographically close to Plaintiffs.

144.    Because removing a housing unit from the NRFU universe is tantamount to giving up on counting the people who live there, the Bureau's insistence on excluding housing units from NRFU based on administrative data that it has discovered are largely inaccurate is arbitrary and an abuse of discretion.

### *Current Unspent Funds That Would Help Mitigate Undercount*

145.    The Consolidated Appropriations Act of 2019 appropriated $3.55 billion to the Bureau for Fiscal Year 2019.

146.    The Conference Report accompanying the Consolidated Appropriations Act of 2019 reads, in relevant part: "The agreement reiterates House and Senate language regarding the Bureau's partnership and communications efforts aimed at maximizing self-response to the 2020 Decennial Census. Additionally, the Bureau shall devote funding to expand targeted communications activities as well as to open local questionnaire assistance centers in hard-to-count communities."

147.    The Conference Report also explains that the cost estimate for the "2020 Decennial Census . . . assumes the need for additional in-person follow-up visits due to fewer households expected to initially respond to the Census."

148.    The House Report accompanying the Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2019 reads, in relevant part: "The Census Bureau is directed to ensure that its fiscal year 2019 partnership and communications activities in

support of the 2020 Census are conducted at a level of effort no less than that conducted during fiscal year 2009 in preparation for the 2010 Decennial Census."

149.    The Senate Report accompanying the Departments of Commerce and Justice, Science, and Related Agencies Appropriations Bill, 2019 reads, in relevant part: "The Committee is concerned about the proposed levels for partnership staff and communications efforts for the 2020 Decennial Census . . . . Additionally, the Committee understands that the 2020 Decennial Census plan includes only about half the number of local field offices and Regional Census Centers compared to the 2010 Decennial Census. Therefore, the Committee expects the Bureau to provide a plan that increases the number of partnership program staff, communication efforts, and field operations; an assessment of increasing external partnerships; and the associated costs, within 45 days of enactment. The plan should include an assessment of doubling the number of partnership staff and increasing the number of area census offices to 300."

150.    Fiscal Year 2019 ended on September 30, 2019. The Bureau currently has over $1 billion unspent from its FY 2018 and FY2019 appropriations.

151.    The Bureau's unspent funds it is holding in reserve would, if used as directed, ameliorate the effects of its drastic cuts in resources for the 2020 Census.

**The Impact of Defendants' Decisions on Plaintiffs**

152.    Plaintiff Newburgh has large Hispanic-American, African-American, and undocumented populations. Defendants consider Newburgh a hard-to-count community for the 2020 Census, just as they did in the 2010 Census. Of Newburgh's six census tracts, two tracts returned just over half of the mailed questionnaires in the 2010 Census, and one tract returned only 63.8 percent.

153.    Forty percent of residents in half of the census tracts in Newburgh had either no home internet subscription or dial-up only from 2013 to 2017. The Bureau's reliance on an untested digital census for 2020 will disproportionately undercount these already hard-to-count individuals.

154.    The Bureau has cut funding and scaled back programs for in-person enumerators and NRFU operations.

155.    Plaintiff Newburgh's census data will be used to determine congressional representation and districting, as well as where to build new schools, businesses, and hospitals. The data will also be used to determine federal funding for vital resources, including transportation, housing, and social services.

156.    Newburgh's residents face actual and imminent injuries based on Defendants' refusal to expend funds on key programs that reach hard-to-count communities.

157.    Newburgh's residents face impending and imminent political underrepresentation and loss of federal funding.

158.    Newburgh has had to divert resources away from other pressing concerns in order to address Defendants' shortcomings. Newburgh's Complete Count Committee has expended time and resources in conducting community outreach and organizing hiring fairs, and the City Council has spent time on promotional and communication efforts to get out the count for the 2020 Census.

159.    Plaintiff CPD Action is a political advocacy organization focused on promoting "equity, opportunity, and a dynamic democracy in partnership with high-impact

base-building organizations, organizing alliances, and progressive unions." It has member and partner organizations in multiple states.

160.     Members of CPD Action reside in communities of color around the country, but the residences of its members are not equally distributed geographically.

161.     The Bureau's own reports have shown that Hispanic and African Americans are concentrated in a relatively small number of states. For example, seventy-five percent of the Hispanic-American population lives in just eight states, including New York. Sixty percent of the African-American population resides in just ten states, including New York.

162.     The loss of a congressional seat in one of those states due to undercounting of hard-to-count populations will result in a net underrepresentation nationwide.

163.     Similarly, the uneven distribution of Hispanic and African Americans is observable at the local level. 2010 Census data indicated, for example, that more than 25 percent of the Hispanic-American population resided in just eight counties nationwide.

164.     African-American populations tend to be concentrated in counties within metropolitan areas. Over 60 percent of counties nationwide have an African-American population of less than 5 percent, while counties outside Southern states with African-American populations between 25 percent and 49.9 percent were overwhelmingly located in metropolitan areas.

165.     Brooklyn, where CPD Action and four of its New York-based partners are headquartered, is the hardest-to-count area in New York State, with over 80 percent of the borough's residents living in hard-to-count neighborhoods. The borough is home to half of the 500 census tracts in New York State that are most at risk of an undercount.

166.    The differential undercount of Hispanic-American, African-American, and immigrant residents and other hard-to-count populations will injure CPD Action members in states, congressional districts, and state legislative districts across the country, by depriving them of federal funding and political power.

167.    The injuries to CPD Action members are not remedied by the windfall of federal funding or political power that will accrue to other residents of the United States who unfairly benefit from the differential undercount of Hispanic or African Americans, even if some CPD Action members happen to reside in some of the states, congressional districts, or state legislative districts that unfairly benefit from the differential undercount.

168.    CPD Action members and the organization itself face actual and imminent injuries based on Defendants' constitutional violations.

169.    CPD Action has had to divert resources from other pressing concerns in order to address Defendants' inadequate preparations for the 2020 Census as part of its Democracy Program.

170.    CPD Action has devoted additional staff time to its efforts to encourage participation in the 2020 Census, has begun providing census-related trainings to its membership units across the country, and has established new census-related partnerships with outside organizations.

171.    In light of Defendants' drastic reductions from previous cycles in preparation and resources needed to conduct a fair and accurate Census, CPD Action has instituted a more thorough effort to promote awareness of and participation in the 2020 Census and is developing plans to address unprecedented challenges associated with the 2020 Census due to Defendants' reduced in-field presence.

172.    Defendants' choices in procedures, such as their approach to digitization, and reductions in field and mailing outreach, have already been made and are being implemented presently, and as a result Plaintiffs are at imminent risk of harm.

173.    If this Court does not act promptly to remedy Defendants' failures, the deficiencies currently present in the 2020 Census will become irremediable, and there will be no amount of funding, hiring, or appropriate planning that can fix the serious existing deficiencies in time for the census.

## CAUSES OF ACTION

### COUNT 1: ARBITRARY AND CAPRICIOUS AGENCY ACTION

*Against Defendants Bureau of the Census and U.S. Department of Commerce*

174.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 173 of this complaint.

175.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

176.    The five decisions set forth in the Final Operational Plan and listed in paragraph 36 this Complaint constitute discrete and final agency actions that are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

177.    Defendants Bureau of the Census and U.S. Department of Commerce have violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

178.    Plaintiffs are aggrieved by this violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## COUNT 2: UNCONSTITUTIONAL AGENCY ACTION

*Against Defendants Bureau of the Census and U.S. Department of Commerce*

179.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 173 of this complaint.

180.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity."

181.    The Constitution requires a fair and accurate count of all persons in the United States. U.S. Const. art. I, § 2, cl. 3.

182.    The five decisions set forth in the Final Operational Plan and listed in paragraph 36 of this Complaint constitute discrete and final agency action that is "contrary to constitutional right" because it deprives Plaintiffs of their constitutional right to a fair and accurate census in 2020.

183.    Plaintiffs are aggrieved by these violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

184.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), authorizes this court to set aside unlawful action by Defendants Bureau of the Census and U.S. Department of Commerce.

## COUNT 3: VIOLATION OF ENUMERATION CLAUSE

*Against All Defendants*

185.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 173 of this complaint.

186.    The Constitution requires a fair and accurate count of all persons in the United States. U.S. Const. art. I, § 2, cl. 3.

187.    The five decisions set forth in the Final Operational Plan and listed in paragraph 36 of this Complaint, individually and cumulatively, deprive Plaintiffs of their constitutional right to a fair and accurate census in 2020.

188.    The refusal to spend any portion of substantial reserve funds bears no reasonable relationship to the conduct of a fair and accurate census.

189.    Defendants have adopted a program for the 2020 Census that is understaffed and underfunded and that inadequately addresses the challenge of reaching hard-to-count populations.

190.    Defendants have violated and are at imminent risk of violating the "actual Enumeration" clause of the United States Constitution, Art. I § 2 cl. 3.

191.    Defendants' violation will lead to an undercount of racial and ethnic minorities and harm the Plaintiffs. This violation will deprive Plaintiffs of their constitutional right to representation and their fair share of resources.

192.    Defendants' violation has caused and will continue to cause ongoing, irreparable harm to Plaintiffs.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

193.    Assume jurisdiction over this matter;

194.    Hold unlawful and set aside the five agency actions listed in paragraph 36 and described in paragraphs 26 through 173 of this Complaint: (a) a plan to hire an unreasonably small number of enumerators; (b) a drastic reduction in the number of Bureau field offices; (c) a significant reduction in the staffing and infrastructure of the Bureau's communications and partnership program, including the elimination of local, physical

33

Questionnaire Assistance Centers; (d) the decision to replace most In-Field Address Canvassing with In-Office Address Canvassing; and (e) the decision to make only extremely limited efforts to count inhabitants of housing units that appear vacant or nonexistent based on unreliable administrative records;

195.    Declare that the Defendants are in violation of their constitutional duty to conduct an accurate actual enumeration of the people;

196.    Declare that Defendants have unlawfully withheld and/or unreasonably delayed expending appropriated funds on the 2020 Census;

197.    Enter an injunction that requires Defendants to implement a plan to ensure that hard-to-count populations will be actually enumerated in the decennial census, which shall include but not be limited to a plan that: (a) restores the Bureau's 2020 Partnership Program to no less than 2010 levels, adjusted for inflation and population growth; (b) augments the Bureau's 2020 Integrated Communications Program to achieve coverage equivalent to the 2010 Census, accounting for inflation, population growth, and the increased cost of advertising in 2020; (c) requires opening a number of in-person Questionnaire Assistance Centers commensurate to that used in the 2010 Census; and (d) increases the number of enumerators to no less than 2010 levels, adjusted for population growth; and

198.    Grant any other and further relief the Court deems appropriate.

Respectfully submitted,

/s/ Michael J. Wishnie

Rachel Brown, Law Student Intern*
Lisa Chen, Law Student Intern*
Daniel Ki, Law Student Intern*
Nikita Lalwani, Law Student Intern*
Geng Ngarmboonanant, Law Student Intern*
Laura Pietrantoni, Law Student Intern*
Joshua Zoffer, Law Student Intern*
Renee Burbank**
Michael J. Wishnie (MW1958)
Peter Gruber Rule of Law Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (203) 436-4780
michael.wishnie@ylsclinics.org

Jeremy M. Creelan
Susan J. Kohlmann
Seth H. Agata
Jacob D. Alderdice,
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
Tel: (212) 891-1600
jcreelan@jenner.com
skohlmann@jenner.com

---

* Motion for Leave to File Law Student
Appearances Forthcoming
** Application for Admission
Forthcoming