**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENTER FOR POPULAR DEMOCRACY ACTION and CITY OF NEWBURGH,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>BUREAU OF THE CENSUS, *et al*.,<br><br>     *Defendants*. | Case No: 1:19-cv-10917-AKH |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**</u>

<u>**PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.   The Bureau's Unreasonable Decision-Making in Underfunding Census Programs .............. 3

    A.   The Bureau Has Significantly Reduced the Staffing and Infrastructure of the
    Communications and Partnership Programs. ................................................................ 4

    B.   The Bureau Plans to Hire an Unreasonably Small Number of Enumerators. ............... 6

    C.   The Bureau Has Drastically Reduced the Number of Census Field Offices ................. 8

    D.   The Bureau Has Replaced Most In-Field Address Canvassing with In-Office
    Address Canvassing. ................................................................................................... 9

    E.   The Bureau Will Make Only Very Limited Efforts to Count Households That
    Appear Vacant or Nonexistent Based on Unreliable Administrative Records ............ 10

II.   The Bureau Has Adequate Funds but Will Not Spend Them ............................................. 11

III.   Defendants' Massive Cuts Will Disproportionately Harm Plaintiffs and Other
    Hard-to-Count Communities. ....................................................................................... 11

LEGAL STANDARD ......................................................................................................... 14

ARGUMENT ..................................................................................................................... 15

I.   Plaintiffs Are Likely to Succeed on the Merits of Their APA and Enumeration Clause
    Claims. ......................................................................................................................... 15

    A.   The Five Challenged Decisions Are Arbitrary and Capricious and Do
    Not Bear a Reasonable Relationship to the Accomplishment of a Fair and
    Accurate Census. ....................................................................................................... 15

        1.   The Bureau Has Made Arbitrary, Unreasonable, and Severe Cuts to its
        Communications and Partnership Programs. ................................................ 17

        2.   The Bureau Has Arbitrarily, Unreasonably, and Drastically Reduced the
        Number of Enumerators. ............................................................................. 20

        3.   The Bureau Has Arbitrarily, Unreasonably, and Drastically Reduced the
        Number of Census Field Offices. ................................................................ 23

        4.   The Bureau Has Arbitrarily and Unreasonably Replaced Most In-Field
        Address Canvassing with In-Office Address Canvassing. .............................. 24

       5.     The Bureau Will Arbitrarily and Unreasonably Count Households That Appear Vacant or Nonexistent Based on Unreliable Administrative Records. .25

    B.    Plaintiffs Are Likely to Show That the Bureau Has Refused to Spend Appropriated Funds That Would Reduce the Differential Undercount. .............................................27

    C.    Directing Expenditure of Appropriated Funds on Communications and Partnership Programs, Enumerators, and QACs Is a Proper Remedy..............................................28

II.   Without Preliminary Relief, Plaintiffs Will Be Irreparably Harmed. ..................................29

III.  The Balance of Hardships and Public Interest Strongly Favor Plaintiffs............................32

CONCLUSION ......................................................................................................................33

**DECLARATIONS**                                            **TAB**

Declaration of Alexandra Church ................................................................................................A

Declaration of Mark Doms.........................................................................................................B

Declaration of Center for Popular Democracy Action ...............................................................C

Declaration of Michael J. Wishnie .............................................................................................D

**EXHIBITS TO DECLARATION OF MICHAEL J. WISHNIE**                    **TAB**

Excerpts of the House Committee Report accompanying the Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2020, H. Rep. 116-101 (June 3, 2019) ..............................................................................................................1

Excerpts of the Further Continuing Appropriations Act, 2020, Pub. L. No. 116-69 ...................2

Explanatory Statement of the Consolidated Appropriations Act, 2020, H.R. 1158, 116th Cong., Division B (2019)...................................................................................3

Excerpts of the Census Bureau's Fiscal Year 2020 budget request, *Budget: Fiscal Year 2020* (Mar. 2019) ...........................................................................................4

Excerpts of the Census Bureau document, *Projections of the Size and Composition of the U.S. Population: 2014 to 2060* (Mar. 2015) ...........................5

Excerpts of the Census Bureau's *2020 Decennial Census Life-cycle Cost Estimate Basis of Estimate* (June 2019)..................................................................................6

Excerpts of the Census Bureau's study, *2010 Census Non-response Follow-up Operations Assessment* (Apr. 2012)..........................................................................7

Excerpts of the transcript of the deposition of Benjamin Taylor, Chief of the Decennial Budget Office, U.S. Census Bureau (July 12, 2019)................................8

Excerpts of the May 2, 2019 presentation, *Update on the 2020 Census* by Albert E. Fontenot, Jr., Associate Director Decennial Census Programs..........................9

Excerpts of the GAO report, *2020 Census: Continued Management Attention Needed to Address Challenges and Risks with Developing, Testing and Securing IT Systems*, GAO-18-655 (Aug. 2018)..................................10

Department of Commerce OIG, *2020 Census: The Number and Location of Area Census Offices May Not Reflect NRFU Workload Demands and Will Not Result in Projected Cost Savings*, No. 18-018-A (Apr. 2018)..............................11

Department of Commerce OIG, *2020 Census: Issues Observed During the 2018 End-to End Census Test Address Canvassing Indicate Risk to Address List Quality*, No. OIG-19-008-A (Feb. 2019)............................12

Excerpts of the GAO report, *2020 Census: Bureau is Taking Steps to Address Limitations of Administrative Records*, GAO-17-664 (July 2017)........................13

*Hard to Count Census Tracts in Orange County, New York*, CUNY Mapping Service, Center for Urban Research, CUNY Graduate Center................................14

Census Bureau, *2010 Census Participation Rates*, Census Explorer..........................15

Census Bureau, *Presence and Types of Internet Subscription in Household*, American Community Survey..................................16

Excerpts of the Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1998 Pub. L. No. 105-119.......................17

Excerpts of the report by A. Rupa Datta et al., *2010 Census Integrated Communications Program Evaluation* ("CIPCE"), Census Planning Memoranda Series, No. 167 (Mar. 13, 2012)......................18

GAO, *2020 Census: Actions Needed to Address Challenges to Enumerating Hard to Count Groups*, GAO-18-599..................................19

Press Release, U.S. House Rep. Sean Maloney, *Maloney, Schumer and Gillibrand Launch Push to Maximize 2020 Census Participation: Officials Stress and Accurate Census Count is Critical to Resources for City of Newburgh* (May 1, 2019)..................................20

Excerpts of the 2019 Consolidated Appropriations Act- Pub.L.No.116-6................................21

Excerpts of the Conference Report accompanying the 2019 Consolidated Appropriations Act, H Rep 116-9 (Feb. 13, 2019)..............................22

Press Release, Census Bureau, *2020 Census In-Field Address Canvassing Operation Ends* (Oct. 21, 2019)........................................................................................23

Press Release, Census Bureau, *2020 Census Starts in Toksook Bay, Alaska* (Jan. 21, 2020).................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Airbnb, Inc. v. City of New York*,
    373 F. Supp. 3d 467 (S.D.N.Y. 2019) .................................................................... 15

*California v. Ross*,
    358 F. Supp. 3d 965 (N.D. Cal. 2019) ................................................................... 16

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980) ........................................................................... passim

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .............................................................................. 28

*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ..............................................................................16, 17, 18, 30

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ............................................................................................. 32

*Guadamuz v. Ash*,
    368 F. Supp. 1233 (D.D.C. 1973) ........................................................................ 28

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) ........................................................20, 23, 24, 28

*Kelly v. Honeywell Int'l, Inc.*,
    933 F.3d 173 (2d Cir. 2019) ................................................................................. 14

*Kravitz v. Dep't of Commerce*,
    366 F. Supp. 3d 681 (D. Md. 2019) ..................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................................... passim

*NAACP v. Bureau of the Census*,
    945 F.3d 183 (4th Cir. 2019) ............................................................................... 33

*Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ............................................................................................. 16

*Natural Resources Defense Council v. E.P.A.*,
    658 F.3d 200 (2d Cir. 2011) .......................................................................... 15, 16

*New York* ex rel. *Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ......................................................................... 29, 32

*New York v. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2018) ......................................................... 16, 18

*State of New York v. Dep't of Justice*,
    343 F. Supp. 3d 213 (S.D.N.Y. 2018) ................................................................ 28

*Wisconsin v. City of New York*,
    517 U.S. 1 (1996) ............................................................................... passim

**STATUTES**

5 U.S.C. § 706(2)(a) ............................................................................................ 15

13 U.S.C. § 141 .................................................................................................. 18

**OTHER AUTHORITIES**

*Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count
    'We the People' in 2020: Hearing Before the H. Comm. On Oversight &
    Reform*, 116th Cong. (2019) ............................................................................ 24

Diana Elliott et al., *Assessing Miscounts in the 2020 Census*, URBAN INST. (2019) .................... 12

Janai Nelson, *Counting Change: Ensuring an Inclusive Census for Communities
    of Color*, 119 COLUM. L. REV. 1399 (2019) ........................................................ 4

*Reaching Hard-to-Count Communities in the 2020 Census, Hearing Before the H.
    Comm. On Oversight & Reform*, 116th Cong. (2020) ........................................... 4

# INTRODUCTION

The federal government has few more vital tasks than conducting the decennial census. Ever since the Fourteenth Amendment overrode the Three-Fifths Clause, the Constitution has mandated that the government count all persons, equally and accurately, every ten years. A decade of political power and the allocation of billions of dollars in federal funds hang in the balance. Yet Defendants' radical alterations to the design of the 2020 Census—and their refusal to spend funds Congress has appropriated—flouts both its constitutional obligation to conduct an "actual Enumeration" and the Administrative Procedure Act's prohibition on arbitrary and capricious agency action. Before it is too late, Plaintiffs seek emergency relief to prevent the largest differential undercount of minority populations in modern history.

For the 2020 Census, public sources and the administrative record establish that Defendants prioritized achieving an arbitrary and unnecessary cost restriction over meeting their constitutional obligation to seek distributive accuracy. Defendants have drastically reduced the key resources that they know are needed to reach what the government terms "Hard-to-Count populations," including: (1) slashing resources for partnerships and community outreach to Hard-to-Count populations, in violation of congressional directives to match 2010 Census levels adjusted for inflation; (2) deploying *two-thirds* the level of enumerators used in 2010, despite a larger population and increased challenges in reaching minority populations; (3) cutting the number of field offices *in half* from the 2010 Census; (4) prioritizing in-office procedures over fieldwork for assembling the Master Address File, despite documented high error rates; and (5) relying on incomplete and inaccurate administrative records instead of field workers to count certain homes.

Defendants' changes to the 2020 Census threaten a massive undercount of communities of color, jeopardizing federal funding and political representation for the communities Plaintiffs represent. These decisions are unreasonable on their face; they are even more unreasonable

considering Defendants admit that they have carried over $1.3 billion from Fiscal Years 2018 and 2019 unspent, a decision a Congressional committee recently called "disingenuous" and one that could "put the 2020 Census at risk during the most critical year of its operation." Declaration of Michael J. Wishnie ("Wishnie Decl."), Exhibit 1 at 14 ("2020 Appropriations House Report"). Congress has since allocated an *additional* $7.28 billion for Fiscal Year 2020. Wishnie Decl., Exhibit 2 at 1134 ("2020 Appropriations Package"). In refusing to spend its funds, the Bureau has ignored Congressional directions—in 2018, 2019, and 2020—to spend appropriated money on outreach and programs designed to count Hard-to-Count communities. This Court's immediate intervention is needed to prevent a massive discriminatory undercount.

Plaintiffs allege that Defendants' five final agency actions listed above violate the Constitution and the Administrative Procedure Act. To remedy these violations, Plaintiffs request a preliminary injunction directing Defendants to expend $770 million of the $1.3 billion in already-appropriated carryover funds in three areas: (1) to increase outreach and communications to no less than 2010 Census levels as directed by Congress (expenditure of an additional $127.8 million); (2) to deploy a number of core enumerators whom Defendants are already hiring but do not intend to use in the field, at no less than 2010 Census levels (expenditure of an additional $597.2 million); and (3) to increase the Bureau's presence within Hard-to-Count communities by increasing the number of fixed Questionnaire Assistance Centers, field offices, and/or mobile questionnaire assistance units within those communities at levels commensurate to 2010 (expenditure of an additional $45.6 million). Plaintiff Center for Popular Democracy Action represents Hard-to-Count communities across the country and seeks this relief on a nationwide level.

## BACKGROUND

The decennial count of the U.S. population requires careful planning and enormous resources to ensure that everyone is counted once and in the right place. By longstanding design,

that process proceeds in three stages. *First*, Census Bureau (the "Bureau") employees canvass the nation's addresses to create a Master Address File ("MAF"). *Next*, the Bureau engages in outreach campaigns to increase the self-response rate. This includes sending mail to every housing unit in the MAF, hiring partnership staff from Hard-to-Count communities to encourage those groups to respond to the census, engaging in advertising campaigns targeted at Hard-to-Count communities, establishing a physical presence in Questionnaire Assistance Centers and field offices, and deploying the Bureau's enumerators to nonresponding housing units in Nonresponse Followup ("NRFU") visits. *Last*, the Bureau enumerates the population.

Across each phase, the Bureau has radically altered and cut back on operations, while reserving more than $1 billion in unexpended appropriations from Fiscal Years 2018 and 2019. The Bureau has refused to expend these funds despite Congress's express instruction that they be spent on the discrete activities challenged in this case so as to prevent a differential undercount. And, as described below, the Bureau has made a series of arbitrary, unreasonable, and sweeping changes that will exacerbate the absolute undercount and the differential undercount of Hard-to-Count populations. The Bureau cannot rationally defend its decisions; it has improperly prioritized alleged cost savings over constitutionally mandated commitments to accuracy and compliance with Congressional funding directives.

## I.    The Bureau's Unreasonable Decision-Making in Underfunding Census Programs.

To cut costs for the 2020 Census, the Bureau has made five discrete design choices that create an imminent risk of a massive differential undercount of Hard-to-Count populations. First, the Bureau has slashed resources for outreach, advertising, and community partnerships, despite express Congressional direction to spend money on these programs. Second, it is reducing the number of enumerators deployed in the field by one-third, despite clear evidence of the importance of enumerators for improving self-response rates among Hard-to-Count communities. Third, it has

severely scaled back its physical infrastructure, cutting the number of field offices by one-half and eliminating physical questionnaire assistance centers entirely. Fourth, it has made the unprecedented decision to largely replace in-field address canvassing with in-office address canvassing shown to be highly inaccurate by the agency's own testing. Last, it has decided to drastically limit its follow-up efforts with certain households based on demonstrably unreliable administrative records. The Bureau's decisions threaten its ability to conduct an actual enumeration and will disproportionately impact Hard-to-Count communities.

### A. The Bureau Has Significantly Reduced the Staffing and Infrastructure of the Communications and Partnership Programs.

The outreach phase of the census is "critical" to raising awareness among the population as a whole and particularly among Hard-to-Count communities. *See* SDNYCENSUS_003620, at 003625, 003633 ("2020 Partnership Plan"); SDNYCENSUS_000577, at 000682 ("Final Operational Plan"). The two complementary programs that comprise this phase of the census—the Partnership Program and the Integrated Communications Program—are also key to assuaging people's fears about participation in the census. *See* Declaration of Dr. Mark Doms ("Doms Decl.") at ¶¶ 10, 23. Such fears are particularly acute among minority populations, who are more likely to have negative attitudes about the census and to report fears that their questionnaire answers will be used against them. *See* Doms Decl. at ¶ 23; *see also* Janai Nelson, *Counting Change: Ensuring an Inclusive Census for Communities of Color*, 119 Colum. L. Rev. 1399, 1424-25 & n. 124, 126 (2019). The Bureau's high-profile litigation regarding the citizenship question has inflamed these fears and negative attitudes even further for the 2020 Census. *See Reaching Hard-to-Count Communities in the 2020 Census, Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (2020).

Through the Partnership Program, the Bureau "traditionally focuses on establishing partnerships with organizations that represent hard-to-count populations." Final Operational Plan at 209 (SDNYCENSUS_000791). The Bureau's own research found that the Partnership Program has a quantifiable effect on mailback rates in Hard-to-Count areas—from 2000 to 2010, an increase in the number of partners in a high Hard-to-Count census tract resulted in a higher mailback rate for that tract. SDNYCENSUS_004887, at 004942 ("2010 Census Evaluation of National Partnership Research Report"). Nevertheless, the Bureau has decreased the size of the Partnership Program from 2010 to 2020. In 2010, the Bureau hired a total of **2,961** partnership staff. Doms Decl. at ¶ 11. For 2020, the Bureau has cut those numbers almost in half, with just **1,630** positions planned. *Id.* at ¶ 12. Adjusted for inflation, the partnership budget has been cut by 29%. *Id.* at ¶ 13.

The Integrated Communications Program is also significantly underfunded. The Communications Program includes paid media advertising, partnership efforts in local communities, and social media communications. *See* SDNYCENSUS_003365, at 003382-83 ("2020 Census Integrated Communications Plan"); *see also* SDNYCENSUS_005198, at 005204 ("2010 Census Integrated Communications Program Report"). On a per-individual basis, the Bureau's spending on advertising compared to 2010 has remained flat. Doms Decl. at ¶ 14. This level of funding will cause an undercount for Hard-to-Count communities. Given cuts to the Partnership Program and other outreach activities and the increased costs of airtime due in part to the 2020 presidential election, *more* spending is required to reach Hard-to-Count communities to even match 2010 levels of awareness. *Id.* at ¶ 50; *see also* 2010 Census Integrated Communications Program Report at v (SDNYCENSUS_005203) (indicating that a strong partnership program and advertising campaign reversed declining mail response rates in prior censuses).

Moreover, the Bureau has drastically reduced funding and staffing for the Partnership and Communications programs despite express Congressional instruction to expend "no less than the level of effort for outreach and communications that was utilized in preparation for the 2010 Decennial Census, adjusted for inflation." Wishnie Decl., Exhibit 3 at H10962 ("Explanatory Statement"). The Bureau has the funds to comply with this instruction but has chosen not to use them.  It refuses to spend over $1 billion that Congress appropriated to it in Fiscal Years 2018 and 2019. *See* Wishnie Decl., Exhibit 4 at CEN-51 ("2020 Budget Request"). The Bureau has flatly ignored Congress's "direct[ions] . . . to prioritize a strong engagement strategy with partners and trusted voices" and spend additional funds on outreach programs. 2020 Appropriations House Report at 15.

### B.  The Bureau Plans to Hire an Unreasonably Small Number of Enumerators.

Because Hard-to-Count populations historically self-respond at much lower rates than the general population, an adequate number of enumerators is essential for reducing the differential undercount. *See* Doms Decl. at ¶ 22. But in order to avoid the costs of these in-person follow-ups, the Bureau plans to significantly reduce the scale of NRFU operations—despite evidence demonstrating that more, and not fewer, enumerators will be needed to obtain responses from Hard-to-Count communities in the 2020 Census.

The population of the United States has increased since 2010, from 308.7 million to approximately 334.5 million people. *See* Wishnie Decl., Exhibit 5 at 2 ("Composition of the U.S. Population"); SDNYCENSUS_006631, at 006633 ("Linking Administrative Records"). In addition, the total number of housing units has increased by 12.7 million compared to 2010. *See* Wishnie Decl., Exhibit 6 at 145 ("2020 BoE"). Based on the increased population alone, an increased NRFU workforce is necessary to reach the 2010 response rate. *See* Doms Decl. at ¶ 25.

But the Bureau is employing more than *two hundred thousand fewer* enumerators than it did in the 2010 Census.

In 2010, the Bureau employed **516,709** enumerators. *See* Wishnie Decl., Exhibit 7 at 222 ("2010 NRFU Operations Assessment"); *see also* Final Operational Plan at 25 (SDNYCENSUS_000607). In 2020, the Bureau intends to train approximately 399,938 enumerators but plans to employ only **260,829** "core enumerators." *See* Wishnie Decl., Exhibit 8 at 117:1-117:15 ("Taylor Dep. Tr."); *see also* SDNYCENSUS_001392, at 001493 ("NRFU Detailed Operational Plan v2.0"). That is, while the Bureau already plans to train only 77.4% as many enumerators as it did in 2010, it intends to actually deploy in the field *a mere 50.5%* of the 2010 enumerator workforce. Based on the Bureau's own data, the Bureau is planning to *reduce* the pool of trained enumerators by 32.6%, even though it anticipates the underlying demand for NRFU resources to *increase* by 16.8%—and perhaps more if the self-response rate falls below expectations. Doms Decl. at ¶ 26.

And it is likely that the self-response rate will fall below expectations. The Bureau estimates that, six weeks after it sends out questionnaires and invitations to respond to the census online, 60.5% of households will have done so—an unreasonable and arbitrary estimate. *See* 2020 NRFU Detailed Operational Plan v2.0 at 2 fn.1 (SDNYCENSUS_001405). In the 2018 End-to-End Test in Providence, Rhode Island—a less diverse community than those represented by Plaintiffs and one with greater internet access—the self-response rate was only 56%. *See* Wishnie Decl., Exhibit 9 at 4 ("Fontenot Presentation"). Among Black responders, the self-response rate was 39%, and for people of Hispanic origin, it was 43%. *Id.* at 4, 8. No test in the 2020 Census life cycle has *ever* produced a self-response rate of 60%, *see* Taylor Dep. Tr. at 131:2-10; *see also*

SDNYCENSUS_005566, at 005568 ("2018 End-to-End Census Test Report Card"), and it is particularly unreasonable to expect such a response from Hard-to-Count populations.

The Bureau has attempted to justify its estimate by claiming that new technology will improve enumerator productivity. *See* Final Operational Plan at 25 (SDNYCENSUS_000607). However, even in the limited testing the Bureau conducted as part of the 2018 End-to-End Test, these technologies did not work as planned, already under pressure because of a series of Bureau delays in "key IT milestone[s]." *See* Wishnie Decl., Exhibit 10 at 9-12 ("GAO, IT Challenges"). The assumptions regarding increased household self-response and enumerator productivity are thus unreliable, and the Bureau's plans to employ a mere half of the 2010 enumerator workforce are correspondingly inadequate.

**C. The Bureau Has Drastically Reduced the Number of Census Field Offices.**

Just as the Bureau has reduced the number of enumerators for NRFU, it has also significantly cut back on the number of brick-and-mortar offices out of which the enumerators and their supervisors work. The Bureau has reduced the number of these offices, now called Area Census Offices ("ACOs"), from 495 in 2010 to just 248 in 2020. *See* Wishnie Decl., Exhibit 11 at 1 ("OIG, NRFU Workload Demands"); *see also* SDNYCENSUS_005184, at 005185 ("Area Census Offices for the 2020 Census"). Thus, the number of enumerators per ACO has increased by 54.5% to a staggering 1,613 enumerators per ACO. The OIG found that the Bureau had not assessed the effect of such an increase and "*could not* know what impact these increases will have on NRFU operations, other than increased costs." OIG, NRFU Workload Demands at 6 (emphasis added).

The Bureau has also jettisoned a program critical to capturing households that are left out of the MAF and that are therefore "missed" during the self-response and NRFU phases of the count. It eliminated nearly 40,000 staffed Questionnaire Assistance Centers ("QACs") and

unstaffed Be Counted sites, which were located primarily in Hard-to-Count areas, and replaced them with only mobile questionnaire assistance units that have no fixed presence. *See* SDNYCENSUS_004749, at 004773 ("2010 QAC Assessment"). However, in 2010, 65% of people who used a QAC reported that they found it by seeing it in person. *See* 2010 QAC Assessment at xiv (SDNYCENSUS_004763). Further, 38% of people who visited QACs did so because they did not receive a census questionnaire, suggesting that they were not in the MAF and would not be counted otherwise. *See id.* It is unreasonable to expect people left out of the MAF, who are disproportionately from Hard-to-Count communities, to find and use mobile-based systems simply to be counted in the census.

### D. The Bureau Has Replaced Most In-Field Address Canvassing with In-Office Address Canvassing.

In previous censuses, the Bureau generated the MAF by sending temporary Bureau employees called "listers" to walk every block in the nation. *See* SDNYCENSUS_000797, at 000806 ("2020 Address Canvassing Detailed Operational Plan"). But in 2020, for the first time in the history of the census, the Bureau canvassed only 35% of blocks in the field.[1] *See* Doms Decl. at ¶ 41. The Bureau is vetting the accuracy of the remaining addresses using only a combination of sources that include satellite imagery, local government records, and information from "third-party data providers" (which they call "in-office" address canvassing). *See* 2020 BoE at 20; Final Operational Plan at 93 (SDNYCENSUS_000675); Address Canvassing Detailed Operational Plan at 6, 39-40 (SDNYCENSUS_000810, 000843-44); Wishnie Decl., Exhibit 12 at 1 ("OIG, Address Canvassing Risk").

---

[1] The Bureau originally stated in the Final Operational Plan that it would canvass 38% in field, Final Operational Plan at 91 (SDNYCENSUS_000673), but it ultimately canvassed only 35%.

The Bureau barely tested "in-office" canvassing prior to implementation, and the End-to-End Test showed significant problems with the new process. The OIG analyzed blocks that in-office review designated as "passive"—where the households on the block are not subject to in-field verification—and found that "in-office address canvassing results differed from in-field results ***in 61 percent of the blocks tested***." OIG, Address Canvassing Risk at 3 (emphasis added).[2] Rather than finding the high error rate alarming, the Bureau proceeded with in-office canvassing even though it "does not know which populations or regions will be most affected by the missed households in passive blocks," *id.* at 11, and blocks "incorrectly designated as passive during in-office address canvassing pose the greatest risk to address list quality," *id.* at 4.

### E.   The Bureau Will Make Only Very Limited Efforts to Count Households That Appear Vacant or Nonexistent Based on Unreliable Administrative Records.

For the 2020 Census, the Bureau is relying on administrative records to classify housing units as occupied, vacant, or nonexistent, and even to enumerate housing units. *See* Final Operational Plan at 124 (SDNYCENSUS_000706). However, non-Hispanic White and economically advantaged communities are more likely to be represented in administrative records than Hard-to-Count communities. *See* Wishnie Decl., Exhibit 13 at 5 ("GAO, Administrative Records"). Accordingly, the Bureau's reliance on administrative records will likely *increase* the differential undercount by enumerating more non-Hispanic White people than people of color. Further, the Bureau's own testing showed the inaccuracy of administrative records, with 30 percent of housing units identified as nonexistent and 18 percent of those identified as vacant found to be occupied. SDNYCENSUS_004562, at 004625 ("2020 Census Program Management Review").

---

[2] This figure does not account for lister error. The OIG found that three of ten observed listers in the End-to-End Test did not follow Bureau procedures. *See* OIG, Address Canvassing Risk at 9.

The direct result of these inaccuracies is that greater numbers of Hard-to-Count communities will be undercounted, worsening the differential undercount.

## II.     The Bureau Has Adequate Funds but Will Not Spend Them.

The Bureau's unreasonable constraint on census spending has led it to carry over appropriated funds, rather than spend them on programs that would deliver an accurate count as directed by Congress. The Bureau has likely carried over $1.3 billion into Fiscal Year 2020 unspent. Taylor Dep. Tr. at 177:16-178:6; *see also* 2020 Appropriations House Report at 14. These unspent funds would help fix the serious problems identified in the Bureau's own data and analysis and pay for a census design that will accurately count Hard-to-Count communities. Adjusted for inflation and for the population increase between 2010 and 2020, the Bureau has cut $127.8 million from the Partnership Program, $597.2 million from NRFU operations, and $45.6 million from QACs compared to 2010 spending. Doms Decl. at ¶ 15. These total approximately $770 million, an amount well less than the Bureau's unspent $1.3 billion in carryover funds. Spending its appropriated money on the programs Plaintiffs have identified would minimize the differential undercount and conform Defendants' conduct to its legal obligations.

## III.    Defendants' Massive Cuts Will Disproportionately Harm Plaintiffs and Other Hard-to-Count Communities.

The Bureau's five unreasonable changes to the census create an imminent risk of a dramatic increase in the differential undercount because they disproportionately disadvantage Hard-to-Count communities, including Plaintiffs. As described above, the Bureau has slashed resources devoted to programs that, at each stage, ensure Hard-to-Count communities, and particularly people of color, are counted. As a result of these cuts, Plaintiffs' expert Dr. Mark Doms[3] estimates

---

[3] Dr. Doms has decades of experience as an economist, including serving as Chief Economist of the Department of Commerce and Under Secretary for Economic Affairs, in which he oversaw

that the differential undercount of Hispanic American and African American populations is likely to increase by *at least two percentage points* in the 2020 Census. Doms Decl. at ¶ 2; *see also* Diana Elliott et. al., *Assessing Miscounts in the 2020 Census*, URBAN INST. 2 (2019).[4]

Such an undercount will significantly harm Plaintiffs: a Hard-to-Count, racially diverse city and a national organization devoted to racial and economic justice. The City of Newburgh is home to significant Hispanic American and African American populations, which are historically undercounted. Declaration of Alexandra Church ("Church Decl.") at ¶ 2; *see Wisconsin v. City of New York*, 517 U.S. 1, 7 (1996). Each census tract in Newburgh is considered Hard-to-Count by the Census Bureau. *See* Church Decl. at ¶ 3; Wishnie Decl., Exhibit 14 ("Hard-to-Count Census Tracts in Orange County, New York") (showing Census Tracts 1 to 6 in Newburgh). In 2000, only 55% of Newburgh's households responded to the initial census questionnaire, and in 2010, only 57% did, both among the lowest rates in New York State. Church Decl. at ¶ 18; *see* Wishnie Decl., Exhibit 15 ("2010 Census Participation Map"). Despite this history of low self-response rates, the Bureau eliminated Newburgh's local QAC for the 2020 Census, increasing the risk that Newburgh will be undercounted. Church Decl. at ¶ 19.

With the Bureau's current plan, Newburgh and its residents face impending and imminent political underrepresentation and loss of federal funding. *Id.* at ¶ 5. For example, Newburgh receives Community Development Block Grants, which are distributed based on data from the decennial census. *Id.* at ¶ 8. Newburgh also receives funding from the Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), calculated in part based on census data; it is

---

the Census Bureau from 2012 through 2015, among other relevant experience. Doms Decl. at ¶ 6.

[4] *Available at* https://www.urban.org/sites/default/files/publication/100324/assessing_miscounts_in_the_2020_census.pdf.

home to one WIC clinic. *Id.* at ¶¶ 10, 11. Newburgh and its residents benefit from these programs, as well as a dozen others that also depend on federal funding calculated based on census data. *Id.* at ¶ 12. A higher net undercount of Newburgh's residents will deprive the City of tens of millions of dollars in federal funding to these programs that Newburgh and its residents benefit from. *Id.* at ¶ 15.

Although the Census Bureau has touted its internet response option as a means of mitigating the impact of its drastic cuts, this reliance on an untested digital census will increase, not mitigate, the impending harm to Newburgh's residents since the proportion of its residents without internet access is significantly higher than the national average. Forty percent of residents in half of the census tracts in Newburgh had either no home internet subscription or dial-up only from 2013 to 2017. *Compare id.* at ¶ 4, *with* Wishnie Decl., Exhibit 16 ("Internet Subscriptions, American Community Survey") (showing below-average internet subscription in Newburgh compared to national average). If the census goes forward with its current deficient design, the harms from the resulting differential undercount would harm Newburgh.

Fearing the disastrous consequences of an undercount, the City of Newburgh has taken its own steps to promote the census. The Newburgh Complete Count Committee has expended time and resources in conducting community outreach and organizing hiring fairs. Church Decl. at ¶ 21. The City Council and city staff have spent time on promotional and communication efforts to get out the count for the 2020 Census. *Id.* at ¶¶ 21, 22. For example, the City has already spent its limited funds to create kiosks in the City so that residents without internet access can respond to the 2020 Census, seeking to redress the Bureau's shortsightedness. *Id.* at ¶ 23.

Plaintiff CPD Action's mission is to ensure the economic, political, and social rights of low-income communities, immigrants, and racial minorities. Declaration of Ana Maria

Archila ("Archila Decl.") at ¶¶ 2, 3. The organization and four of its New York-based affiliates are headquartered in Brooklyn, New York, the hardest-to-count area in New York State. *Id.* at ¶ 5. Its members reside in low-income and minority communities around the country and, as a result, will be deprived of political power by a higher differential undercount of Hard-to-Count communities. *Id.* at ¶ 6. In addition, CPD Action members will lose out on critical federal funding for their communities and programs on which they rely if Hard-to-Count communities are undercounted, including funding from Community Development Block Grants and WIC. *Id.* at ¶¶ 9-12.

In response to the Bureau's arbitrary and irrational decisions, such as its use of digitization and reductions in in-field outreach, CPD Action is diverting resources from other projects for use in its Democracy Program to address the imminent risk of a high differential undercount. *Id.* at ¶¶ 14-17. It has also begun providing census trainings to its membership units across the country and has established new census-related partnerships with outside organizations. *Id.* at ¶ 15. The reason for this diversion of resources is simple. If the 2020 Census goes forward with its current deficient design, the harms from the resulting differential undercount would harm CPD Action, its members, and the communities it represents. *Id.* at ¶¶ 17, 19.

## LEGAL STANDARD

A preliminary injunction is warranted when "the movant [establishes] (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183-84 (2d Cir. 2019) (internal quotations omitted). Critically, the Second Circuit has adopted the "fair ground for litigation" standard for preliminary injunctions in a prior census challenge because of the significant public interest in an accurate census. *Carey v. Klutznick*, 637 F.2d 834,

839 (2d Cir. 1980). Even with the "likelihood of success" standard, plaintiffs "need only make a showing that the probability of their prevailing is better than fifty percent." *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 480 (S.D.N.Y. 2019) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d. Cir. 1988)).

## ARGUMENT

### I.  Plaintiffs Are Likely to Succeed on the Merits of Their APA and Enumeration Clause Claims.

For each of the challenged decisions, Plaintiffs are likely to establish that Defendants have violated the APA, as Defendants' actions are arbitrary and capricious and lack any rational connection between the "facts found and the choice made." *Natural Resources Defense Council v. E.P.A.*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Likewise, for each of the decisions at issue, Plaintiffs are likely to establish that Defendants have violated the Enumeration Clause because their actions will unreasonably undermine the distributive accuracy of the census and worsen the undercount of marginalized communities. *See Wisconsin*, 517 U.S. at 20 (holding that the Constitution's design evinces a clear "preference for distributive accuracy" in the census). At a minimum, Plaintiffs have established sufficiently serious questions going to the merits to make them a fair ground for litigation. Defendants' derogation of their statutory and constitutional obligations will harm Plaintiffs by depriving them of crucial federal funding and diluting their rightful political representation.

### A.  The Five Challenged Decisions Are Arbitrary and Capricious and Do Not Bear a Reasonable Relationship to the Accomplishment of a Fair and Accurate Census.

The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). Agency action is arbitrary and

15

capricious when an agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). Further, for agency action to be lawful, "the record must show that the agency examined the relevant data and articulated a satisfactory explanation for its action" and "must reveal a rational connection between the facts found and the choice made." *NRDC v. EPA*, 658 F.3d at 215 (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted).

Courts have enjoined unlawful Bureau activity with respect to the decennial census under the APA. *See, e.g.*, *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2018), *aff'd in part, rev'd in part and remanded sub nom*, 139 S. Ct. 2551 (2019); *California v. Ross*, 358 F. Supp. 3d 965 (N.D. Cal. 2019); *Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681 (D. Md. 2019). Just last year, the Supreme Court held in *Department of Commerce v. New York* that the "taking of the census" is judicially reviewable under the APA and set aside the Bureau's decision to add a citizenship question to the 2020 Census questionnaire. 139 S. Ct. at 2568. When the Second Circuit reviewed a challenge similar to the instant case, regarding the inadequacy of the Bureau's operational procedures, it affirmed the district court's preliminary injunction under the APA. *Carey*, 637 F.2d at 838-39. The district court's order required the Bureau to implement more accurate processes in counting Hard-to-Count populations in New York, *id.*, as Plaintiffs' requested preliminary injunction would here.

The Enumeration Clause, for its part, requires that Defendants' actions bear a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind

the constitutional purpose of the census" to fairly and accurately "determine the apportionment of the Representatives among the States." *Wisconsin*, 517 U.S. at 20; *see also New York*, 139 S. Ct. at 2566. A "preference for distributive accuracy (even at the expense of some numerical accuracy)" follows from this constitutional purpose. *Wisconsin*, 517 U.S. at 20.

The Second Circuit has concluded that systemic failures in the conduct of the census may establish an Enumeration Clause violation and provide grounds for a preliminary injunction. In *Carey v. Klutznick*, the court held that the plaintiffs established a likelihood of success on their Enumeration Clause claim when they complained of "grossly inadequate" "master address registers" and argued that the "follow-up check" of those address registers was deficient and had a disproportionately adverse impact on minority residents. 637 F.2d at 836, 839. The Second Circuit affirmed the district court's finding that the plaintiffs "sufficiently established a factual predicate for their claims to the effect that a census undercount is inevitable, that the undercount is particularly large among minority populations that are heavily concentrated in New York, and that Census Bureau procedures were inadequate in New York to avoid this disproportionate undercount." *Id.* at 839. The Second Circuit's holding in *Carey* is even more applicable to Defendants' grossly inadequate plans for the 2020 Census challenged here. At the very least, it is clear that the serious issues Plaintiffs have raised are "fair ground for litigation." *Id.*

### 1. The Bureau Has Made Arbitrary, Unreasonable, and Severe Cuts to its Communications and Partnership Programs.

Congress has directed the Bureau to conduct communications and outreach activities at a level of effort no less than that used for the 2010 Census, adjusted for inflation. *See* Explanatory Statement at H10962. And as set forth above, the Bureau has acknowledged that outreach is "critical" to raising awareness of the census among Hard-to-Count communities and assuaging their fears and uncertainties regarding the use of their personal information. *See* 2020 Partnership

Plan at 1, 10 (SDNYCENSUS_003625, SDNYCENSUS_003634); Final Operational Plan at 100 (SDNYCENSUS_000682). Yet despite the clear importance of communications and outreach, Defendants have not put in place the "aggressive and innovative outreach campaigns" that Congress intended. *See* Wishnie Decl., Exhibit 17 at 2481 ("Department of Commerce Appropriations Act 1998") (codified as note to 13 U.S.C. § 141). Instead, Defendants have slashed funding, staffing, and operations for the Communications and Partnership programs, significantly reducing their outreach to Hard-to-Count communities from prior years. Such decisions will unreasonably and arbitrarily compromise the distributive and overall accuracy of the 2020 Census, in violation of the APA and the Constitution. *See New York*, 139 S. Ct. at 2569 (holding that Census Bureau has a duty to "conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment") (internal quotations omitted); *Carey*, 637 F.2d at 839 (holding that plaintiffs had established probability of success on Enumeration Clause claim because "our Constitution's plain objective [is to make] equal representation for equal numbers of people the fundamental goal").

For years, the Bureau has recognized the value of the outreach it is now reducing. Its own research from 2012 demonstrates that its communications and partnerships programs were essential to reducing the differential undercount of African American communities in 2010. *See* Wishnie Decl., Exhibit 18 at 143 ("2010 Census Integrated Communications Program Evaluation"); *see also* Final Operation Plan at 209 (SDNYCENSUS_000791) (the Bureau "traditionally focuses on establishing partnerships with organizations that represent hard-to-count populations"). Furthermore, the Bureau has ignored the advice of its own advisory committees by refusing to spend funds at levels commensurate to 2010 on its Partnership Program; in 2016, the

Census Bureau National Advisory Committee on Racial, Ethnic, and Other Populations ("NAC")[5] made exactly such a recommendation to the Bureau to no avail. *See* SDNYCENSUS_005522, at 005523 ("Integrated Partnerships and Communications Working Group: Proposed Recommendations") ("[T]he Partnerships Program has more impact on reaching Hard to Count populations than nearly any other single program run by the Bureau. As the Bureau makes funding decisions regarding the 2020 Census, we strongly urge that staffing for the Partnerships Program equal or exceed the staffing levels in 2010.").

Instead, the Bureau has slashed partnerships spending by 29 percent on an inflation-adjusted basis from 2010 levels, cut the Partnership Program staff in half from 2010, and refused to increase spending on the Communications Program on a per-household, inflation-adjusted basis compared to 2010. The Bureau has taken these actions despite evidence that public awareness of the census is at a perilous low given increased distrust in government and heightened concerns over privacy and confidentiality. *See* Doms Decl. at ¶¶ 12, 13, 14, 23. And it has done so despite the knowledge that its actions are in direct violation of the NAC's recommendations and Congress's express directives.

Most worrisome, the Bureau has eliminated nearly 2,000 partnership assistants from the budget without making any effort to determine whether that position is necessary to the successful operation of the 2020 Census. *See* Wishnie Decl., Exhibit 19 at 32 ("GAO, Challenges to Enumerating HTC Groups"). In 2010, the Bureau "did not clearly link the positions . . . for individual staff . . . to the roles they subsequently played in carrying out the partnership efforts." *Id.* at 25. By eliminating the partnership assistant position, then, the Bureau cut roughly half of the

---

[5] The NAC was established in 2012 and is tasked with advising the Bureau on topics such as hard-to-reach populations and race and ethnicity. *See* https://www.census.gov/about/cac/nac.html.

Partnership Program despite not knowing exactly what those individuals did to support the 2010 operation, how their tasks would be accomplished for 2020, and whether cutting them would adversely affect the goal of reaching Hard-to-Count communities. The Bureau has done this despite the APA's requirement that it draw "a rational connection between the facts found and the [policy] choice" that results. *State Farm*, 463 U.S. at 43. It has likewise defied the Constitution's "preference for distributive accuracy." *Wisconsin*, 517 U.S. at 20.

These deficiencies in the Communications and Partnerships Programs are virtually guaranteed to reduce the response rates in Plaintiffs' communities and increase the differential undercount, *see* Doms Decl. at ¶¶ 10, 16, and at minimum establish enough serious questions on the merits to make them a fair ground for litigation. The Bureau's refusal to expend appropriated funds to return outreach and partnerships spending to 2010 levels—in spite of concrete evidence before the agency of its importance in enumerating Hard-to-Count communities—is arbitrary and capricious and bears no reasonable relationship to conducting an actual enumeration. As Dr. Doms has calculated, it would cost the Bureau only $127.8 million in already appropriated funds to follow Congress's command. Doms Decl. at ¶ 15. And the Constitution requires that when funds are "appropriated by Congress for a particular project or program," executive agencies "[do] not have unilateral authority to refuse to spend the funds." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

**2.      The Bureau Has Arbitrarily, Unreasonably, and Drastically Reduced the Number of Enumerators.**

Defendants' drastic cuts to staffing in the field, including its decision not to deploy the full number of enumerators it will hire, will further increase the differential undercount because there will be insufficient personnel to follow up with members of Hard-to-Count communities. As explained by Dr. Doms, the Bureau has cut its enumerator staffing by over 25% compared to 2010,

constituting a loss of hundreds of thousands of enumerators, despite a nearly 6% increase in the total U.S. population in that same period. *See* Doms Decl. at ¶¶ 19, 25. Further, the Bureau does not plan to deploy all of the enumerators it hires, but only a subset of "core enumerators." *See* Doms Decl. at ¶ 20, ¶ 31 n.33. These cuts will disproportionately impact Hard-to-Count communities. Enumerators and staff in the field are necessary to reach non-responding individuals and have been used for this purpose in recent censuses. *See* Doms Decl. at ¶ 17. Without such resources, communities such as Plaintiffs' that have higher non-response rates are more likely to be missed by NRFU operations. At the very least, Defendants' unreasonable cuts to its enumerator staffing qualify as fair grounds for litigation.

Contrary to statements in the Final Operational Plan, the reduction in enumerators will not be offset by the increased productivity of individual enumerators and a decrease in the NRFU workload. *See* Final Operational Plan at 9 (SDNYCENSUS_000591). The Bureau's claim of increased enumerator productivity is based on unreliable and insufficient data about the use of new technology and protocols tested only partially in a single dress-rehearsal held at a site that does not provide a reliable proxy for the nation as a whole. *See* GAO, IT Challenges at 9-12.

The Bureau's assumptions regarding a reduced NRFU workload are irrationally optimistic for three additional reasons. First, the Bureau fails to account for its own studies showing that self-response rates are likely to be *twenty* percentage points lower in 2020 than in 2010. *See* SDNY_006010, at 006015, 006021 ("2020 Census Barriers, Attitudes, and Motivators Study Survey Report") (67% of householders who participated in Census Barriers, Attitudes and Motivators Study for 2020 were "extremely likely" or "very likely" to complete a census form, compared to 86% of study participants surveyed for 2010).

21

Second, the Bureau unreasonably assumes that soliciting online census responses will increase the self-response rate, despite the fact that, in the only End-to-End Test the Bureau conducted in preparation for the 2020 Census, just 56% of individuals self-responded (Defendants had expected a self-response rate of 60.5% for the 2020 Census overall). *Compare* Fontenot Presentation at 4, *with* 2020 BoE at 50. Among Black responders, the self-response rate in the End-to-End Test was 39%; for people of Hispanic origin, it was 43%. Fontenot Presentation at 4, 8. Moreover, only 54% of the African Americans and 59% of the Hispanic individuals who responded used Internet Self-Response—an overall response rate by internet of 21% for the African American population and 25% for people of Hispanic origin—compared to 65% of the general test population. *See id.* at 5, 9; Doms Decl. at ¶ 22.

Third, the Bureau assumes without adequate testing that enumerating households based on administrative records will significantly reduce the NRFU workload. *See* Final Operational Plan at 8-9 (SDNYCENSUS_000590-91). But non-Hispanic White and economically advantaged communities are more likely to be represented in administrative records than Hard-to-Count communities, potentially exacerbating the differential undercount even further. *See* GAO, Administrative Records at 5 ("[T]he records generally tend to over-represent white and economically advantaged populations in comparison to how other groups appear in the records.").

The APA does not permit the Bureau to justify its decision to dramatically reduce the number of enumerators with "an explanation . . . that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. But that is precisely what its untested and unrealistic assumptions about enumerator productivity represent. The Bureau's cuts also bear no "reasonable relationship to the accomplishment of an actual enumeration of the population," nor do they respect the Constitution's "preference for distributive accuracy," as they exacerbate—instead of remedy—

historical undercounts of Hard-to-Count communities. *Wisconsin*, 517 U.S. at 20. It would cost the Bureau $597.2 million to spend the same amount on NRFU as it did in 2010, less than half of the $1.3 billion the Bureau has in carryover funds. Doms Decl. at ¶ 15. The Bureau's refusal to expend these funds—a decision it may not make unilaterally, *In re Aiken Cty.*, 725 F.3d at 261 n.1—is arbitrary and capricious and in violation of the Constitution.

### 3. The Bureau Has Arbitrarily, Unreasonably, and Drastically Reduced the Number of Census Field Offices.

The Bureau has drastically and irrationally reduced its number of field offices for the 2020 Census, slashing the number nearly in half compared to 2010. Field offices play a critical role in recruiting, hiring, training, and supervising field staff for address canvassing and NRFU. *See* NRFU Detailed Operational Plan v.2.0 at 2 (SDNYCENSUS_001450-451). Field offices also help to organize staff to address problems that arise during address canvassing and NRFU, which is even more important in 2020 given the introduction of novel methods and technologies. *See* Doms Decl. at ¶ 32. But the Bureau has pushed forward with this decision nonetheless, offering no reasoned explanation for how these offices will be able to handle a staggering 54.5% increase in enumerators per ACO. *See supra* at Section I.C. Critically, the agency has not even studied how fewer field offices will affect NRFU operations, *see id.*, a clear violation of the APA's mandate for reasoned decision-making.

The Bureau has also eliminated other forms of physical outreach. In a drastic departure from the use of "expanded questionnaire assistance operations" lauded by the Supreme Court in *Wisconsin*, 517 U.S. at 8, Defendants have eliminated in-person "QACs" altogether, even though in the 2010 Census such sites added 760,748 additional people to the count. *See* 2010 QAC Assessment at xvi (SDNYCENSUS_004765). In fact, the City of Newburgh specifically requested a physical QAC to be located within the City for the 2020 Census, recognizing the importance of

having a visible, stationary center for its residents to use. *See* Wishnie Decl., Exhibit 20 at 2 ("Maloney, Schumer & Gillibrand Press Release"). But the Bureau has replaced the physical QACs and Be Counted sites with only a mobile program called Mobile Questionnaire Assistance. *See* SDNYCENSUS_006596 at 006609 ("2020 Census Update"). Completely untested, the Mobile Questionnaire Assistance program will have no fixed presence and instead will consist of staffers being deployed to areas the Bureau deems to be experiencing low self-response rates, *id.*, like teenagers with clipboards canvassing for donations on a Manhattan street corner. The U.S. House of Representatives Committee on Oversight and Reform has specifically expressed concern regarding the Bureau's decision to cut physical QACs despite having over a billion dollars of unspent funds. *See Beyond the Citizenship Question: Repairing the Damage and Preparing to Count 'We the People' in 2020: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. (2019) ("House Oversight Committee, Preparing to Count") (Statement of Rep. Raskin, Member, H. Comm. on Oversight and Reform at 3:38). As Dr. Doms has calculated, it would cost the Bureau only $45.6 million to establish the number of physical QACs it had in 2010. Doms Decl. at ¶ 15. The Bureau cannot justify these cuts where Congress has allocated funds and urged the Bureau to spend them; the APA, after all, bars the Bureau from "rel[ying] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. And executive agencies cannot refuse to spend funds unilaterally that were "appropriated by Congress for a particular project or program." *In re Aiken Cty.*, 725 F.3d at 261 n.1.

### 4.    The Bureau Has Arbitrarily and Unreasonably Replaced Most In-Field Address Canvassing with In-Office Address Canvassing.

The Bureau's decision to reduce in-field address canvassing and replace it with in-office address canvassing for the first time is unreasonable and will negatively impact the accuracy of the 2020 Census. *See* Doms Decl. at ¶¶ 41, 44. In deciding to rely on in-office procedures, the

Bureau has cited the need to reduce costs. Doms Decl. at ¶ 36. However, the OIG as well as the Bureau's limited field testing have shown that the use of address lists developed mostly in-office is significantly less accurate than using lists developed in-field. Indeed, the Bureau's own testing indicated that as many as 1.4 million households could be missed as a result. *See* OIG, Address Canvassing Risk at 11. As demonstrated by Dr. Doms, these households are disproportionately likely to come from Hard-to-Count communities. *See* Doms Decl. at ¶ 44. Accordingly, Plaintiffs' response rates will be lower, and the differential undercount will increase. The Bureau may not simply charge ahead with a "decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Defendants' decision to use in-office canvassing in the face of contradictory evidence is arbitrary and capricious and does not bear a reasonable relationship to conducting a fair and accurate census.

5. **The Bureau Will Arbitrarily and Unreasonably Count Households That Appear Vacant or Nonexistent Based on Unreliable Administrative Records.**

Finally, the Bureau's decision to rely heavily on administrative records in enumeration will undermine the accuracy of the 2020 Census, particularly for Hard-to-Count communities. In prior censuses, the Bureau relied solely on in-person enumeration of households. In 2020, however, the Bureau plans to rely on administrative records to classify housing units as occupied, vacant, or nonexistent, as well as to enumerate housing units that do not initially self-respond and cannot be reached after one visit. *See* Final Operational Plan at 125 (SDNYCENSUS _000707).

Defendants have been aware of the poor quality of its administrative records for years, yet arbitrarily continue to rely on them. The Bureau's 2015 Census Pre-Test in Maricopa County found that for households determined to be vacant using administrative records, ***less than half (46%)*** were actually vacant when fieldworkers visited the units in person. *See* SDNYCENSUS_024375, at 024383 ("Discussion of Use of Administrative Data"). The Bureau's staff self-described the

finding as "PROBLEMATIC" in a March 2017 presentation. *Id.* (emphasis in original). Census Pre-Tests in 2016 produced similarly alarming results. *Id.* at 024384. But the Bureau has not deviated from its plans to use administrative records in enumeration, despite the plain results of its own tests demonstrating staggeringly high error rates.

This will exacerbate the differential undercount of Hard-to-Count communities. Non-Hispanic White and economically advantaged communities are more likely to be represented in administrative records than Hard-to-Count communities and more likely to be enumerated as a result. *See* GAO, Administrative Records at 5. In addition, census research has found that households are more likely to be predicted vacant in areas with large shares of African Americans. Doms Decl. at ¶ 46; *see also* Discussion of Use of Administrative Data at 11 (SDNYCENSUS_024385) ("[Administrative record] strategy less frequent in determining occupancies but more frequent in determining vacancies in neighborhoods with high % Black."). The Bureau's own testing has also revealed that the use of administrative records was less helpful "in determining vacancies or occupancies in neighborhoods with [a] high % [of] Hispanic[s]." Discussion of Use of Administrative Data at 11 (SDNYCENSUS_024385). Accordingly, the Bureau's reliance on administrative records will increase the differential undercount by enumerating more non-Hispanic White people than people of color. *Id.* Defendants' decision to rely on administrative records in the face of evidence that those records are highly inaccurate, particularly for Hard-to-Count populations, is arbitrary and capricious and bears no "reasonable relationship to the accomplishment of" a fair and accurate "enumeration of the population." *Wisconsin*, 517 U.S. at 20. And, at minimum, the serious questions raised by this decision—as well as the four others documented above—undoubtedly constitutes "fair ground for litigation." *See* 637 F.2d at 839.

**B. Plaintiffs Are Likely to Show That the Bureau Has Refused to Spend Appropriated Funds That Would Reduce the Differential Undercount.**

The decisions outlined above are especially unreasonable in light of the Bureau's refusal to spend funds Congress has appropriated for these very purposes. The Bureau carried over more than $1 billion from Fiscal Years 2018 and 2019 unspent, *see* 2020 Budget Request at CEN-51, and was appropriated $7.3 billion more for Fiscal Year 2020. *See* 2020 Appropriations Package at 1134. But the Bureau has failed to give a satisfactory explanation for failing to expend this money on key programs such as NRFU and outreach. *See* Taylor Dep. Tr. at 176:13-178:2. To the extent that the Bureau has given reasons for drastically cutting such programs, it has claimed that it needs to cut costs to implement those programs at levels commensurate to 2010. *See* Doms Decl. at ¶¶ 36, 40. Those reasons are belied by the Bureau's unspent appropriations.

In failing to expend these appropriated funds, the Bureau has also ignored clear Congressional direction to engage in additional outreach and promotion. *See* Wishnie Decl., Exhibit 21 at 94 ("2019 Appropriations Act"). Members of Congress have explicitly indicated the need for the Bureau to spend more on outreach. *See* House Oversight Committee, Preparing to Count (statement of Rep. Jamie Raskin at 3:33) ("In light of the damage done, I think the Bureau should increase outreach to hard to count communities instead of sitting on a billion dollars in appropriated funds . . . I fail to see a compelling reason for the delay."); *see also* 2020 Appropriations House Report at 14-15. Further, Congress has long affirmed that it "is committed to providing the level of funding that is required to . . . accurately enumerat[e] all individuals who have historically been undercounted, and toward this end, Congress expects . . . aggressive and innovative promotion and outreach campaigns in hard-to-count communities." Department of Commerce Appropriations Act 1998 at 2481. The Bureau's refusal to spend the money it already

has to counteract harms that will flow from its census design defies both reason and clear Congressional commands.

This Court should hold unlawful the Bureau's refusal to spend appropriated funds on these vital resources and direct the Bureau to use these funds for the operations necessary to reach Hard-to-Count communities. *See, e.g.*, *State of New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 238 (S.D.N.Y. 2018) (vacating DOJ's decision to condition grants to plaintiff "absent congressional authorization . . . [to] redistribute or withhold . . . appropriated funds in order to effectuate its own policy goals") (internal quotations omitted). Where an executive agency has refused to spend appropriated funds pursuant to the factors prescribed by Congress, courts have instructed the agency to spend those funds in the appropriate manner. *See id.* at 245 (ordering defendant agency to disburse improperly conditioned grants to plaintiff). "The Executive Branch does not have the power of the purse." *Id.* at 238. Even though an executive agency may have "policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it "does not have unilateral authority to refuse to spend the funds." *In re Aiken Cty.*, 725 F.3d at 261 n.1; *see also City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018); *Guadamuz v. Ash*, 368 F. Supp. 1233, 1244 (D.D.C. 1973) ("Money has been appropriated by the Congress to achieve the purposes of both programs and the Executive has no residual constitutional power to refuse to spend these appropriations.").

**C.  Directing Expenditure of Appropriated Funds on Communications and Partnership Programs, Enumerators, and QACs Is a Proper Remedy.**

The Bureau has more than enough funds to cure the deficiencies outlined above and to pay for a census design that will accurately count Hard-to-Count communities. Congress repeatedly directed the Bureau in 2018 and 2019 to spend appropriated funds on outreach, QACs, and programs designed to count Hard-to-Count communities, a command the Bureau has ignored. *See*

2019 Appropriations Bill at 94; *see also* 2020 Appropriations House Report at 14-15; Wishnie Decl., Exhibit 22 at 611 ("2019 Appropriations Conference Report") ("[T]he Bureau shall devote funding to expand targeted communications activities as well as to open local questionnaire assistance centers in hard-to-count communities."). In passing the Bureau's most recent appropriations, Congress included an explanatory statement accompanying the final law specifically directing the Bureau to implement the 2010 baseline (adjusted for inflation) for outreach and communications activities, which would help prevent an inaccurate count of Hard-to-Count communities. *See* Explanatory Statement at H10962.

In addition, the Bureau still has sufficient time to expend some of those funds to deploy more "core enumerators," expand outreach efforts, and increase the number of in-person QACs and mobile assistance units. Indeed, the total cuts from 2010 levels to partnership programs, NRFU, and QACs add up to $770 million, *far less* than the amount the Bureau has on hand in carryover funds alone. *See* Doms Decl. at ¶ 15. It is not yet too late for the Bureau to spend appropriated funds on these vital activities.

## II.  Without Preliminary Relief, Plaintiffs Will Be Irreparably Harmed.

Absent immediate judicial intervention, Plaintiffs will be irreparably harmed by Defendants' decisions to drastically cut resources to enumerate Hard-to-Count communities in the 2020 Census. "Irreparable harm is injury that is . . . actual and imminent and that cannot be remedied by an award of monetary damages." *New York* ex rel. *Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (internal quotation omitted). Given the imminent risk of a massive differential undercount due to Defendants' actions that cannot be remedied by any post-hoc relief, Plaintiffs meet this threshold.

Dr. Doms predicts that the cumulative effect of the Bureau's challenged actions will increase the differential undercount of Black and Hispanic communities by at least two percentage

points, representing the largest differential undercount in the modern history of the census. Doms Decl. at ¶ 49. These increases are *above and beyond* the already-documented historical undercounts for African Americans (2.90% in 2010) and Hispanic Americans (2.38% in 2010) from prior censuses, *id.* at ¶ 2, and the impacts of such an undercount would be concrete and severe, lasting at least until the 2030 Census. The impending undercount has already forced Plaintiffs City of Newburgh and CPD Action to divert resources. Church Decl. at ¶ 20-23; Archila Decl. at ¶ 14-18. Further, the undercount's effects on Plaintiffs' political representation and federal funding are stark. New York State is at risk of losing a federal congressional seat due to the Bureau's challenged actions, a massive loss of political power for Plaintiffs City of Newburgh and CPD Action. Church Decl. at ¶ 16. CPD Action members across the country will have their political power diluted and federal funds diverted to other communities. Archila Decl. at ¶ 6. Plaintiff City of Newburgh would likely lose representation in the New York State Legislature and millions of dollars in federal funding because of the Bureau's failures. Church Decl. at ¶¶ 15, 17.

These harms—"diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources"—are precisely the types of harms that the Supreme Court recognized in *Department of Commerce v. New York* as "concrete and imminent injur[ies]," 139 S. Ct. at 2565-66, and that the Second Circuit recognized in *Carey v. Klutznick* as "concrete harm[s]," 637 F.2d at 838. In particular, the Supreme Court in *Department of Commerce* found that the plaintiffs had standing because if they were "undercounted by as little as 2%—lower than the District Court's 5.8% prediction—they w[ould] lose out on federal funds that are distributed on the basis of state population." 139 S. Ct. at 2565. Plaintiffs' injuries here are identical to those recognized by the Supreme Court and the Second Circuit and are sufficient to establish that Plaintiffs will be harmed as a result of Defendants' constitutional and statutory violations.

Furthermore, these harms must be redressed now. With each passing day, it becomes increasingly difficult to undo the effects of the Bureau's actions on Hard-to-Count communities. In-field address canvassing is now complete. *See* Wishnie Decl., Exhibit 23 ("2020 In-Field Address Canvassing Ends"). The 2020 Census has officially begun. *See* Wishnie Decl., Exhibit 24 ("2020 Census Starts in Alaska"). And as the 2020 Census continues to progress, the effects of the Bureau's failures will only accumulate and magnify. Hard-to-Count communities left off the MAF from erroneous in-field address canvassing will not receive a census questionnaire or nonresponse follow-up. Self-response rates will be further depressed by the Bureau's drastic cuts to its Communications and Partnership programs and its elimination of physical QACs. And in the final stage of the census, substantial decreases in the enumerator workforce and the use of demonstrably unreliable administrative records will exacerbate the undercount for Hard-to-Count communities, already less likely to self-respond and harmed by the Bureau's errors in previous phases. While the Bureau has the appropriated funds to remedy its unconstitutional and arbitrary and capricious actions, the window for such remedies is rapidly closing, as the actions' effects domino and the 2020 Census races towards its final stages.

Immediate judicial intervention is the only plausible remedy for Plaintiffs' actual and imminent harms. As Congress has stated, "the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for . . . the courts of the United States to provide[] meaningful relief *after* such enumeration has been conducted." Department of Commerce Appropriations Act 1998 at 2481 (emphasis added). And the Supreme Court has held that "wait[ing] until the census has been conducted to consider" plaintiffs' challenges to the census "would result in extreme—possibly

irremediable—hardship." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 332 (1999). Any further delay will amplify the harms already suffered by Plaintiffs and render corrective action by the Bureau impossible. Plaintiffs depend on the Court's immediate intervention. If the Bureau is not timely ordered to remedy its challenged actions by expending some of its $1.3 billion in unspent appropriated funds, Plaintiffs will suffer irreparable harm.

## III.   The Balance of Hardships and Public Interest Strongly Favor Plaintiffs.

The balance of the hardships tips decidedly in Plaintiffs' favor, in light of the enormous amount of political power and billions of dollars in federal funding at stake for the next ten years and the impossibility of remedying a differential undercount after the fact. The burden on Defendants to remedy its failures is significantly less than the burden to Plaintiffs—and to the country as a whole—of an inadequately conducted census resulting in a large differential undercount, the inevitable result of Defendants' refusal to spend appropriated funds on the level of Communications and Partnership programs directed by Congress; deploy additional "core" enumerators; and increase QACs, field offices, and mobile assistance units. Not only does the Bureau have a constitutional and statutory obligation to conduct an "actual Enumeration" of the population, it already possesses the money to fix these design flaws and has been instructed to do so by Congress.

Finally, an injunction such as that sought by Plaintiffs to remedy the deficiencies in the Bureau's planning and preparations will ensure a more accurate census and is indisputably "in the public interest." *New York* ex rel. *Schneiderman*, 787 F.3d at 650. The constitutional command of an "actual Enumeration" requires "distributive accuracy," which can be accomplished only by a census that is properly designed to count Hard-to-Count communities. *See Wisconsin*, 517 U.S. at 20 (holding that distributive accuracy "follow[s] from the constitutional purpose of the census"). As the Second Circuit has found, the "public interest . . . requires obedience to the Constitution

and to the requirement that Congress be fairly apportioned, based on accurate census figures." *Carey*, 637 F.2d at 839; *see also id.* ("[I]t is in the public interest that the federal government distribute its funds, when the grant statute is keyed to population, on the basis of accurate census data"). "Nothing is more existential to the preservation of the 'Republic' than requiring an 'actual Enumeration' without 'partiality or oppression.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 194 (4th Cir. 2019) (Gregory, C.J., concurring) (internal citations omitted). Accordingly, this Court should grant the requested injunction to ensure an accurate census and avoid a differential undercount that would deprive Plaintiffs and other Hard-to-Count communities of the public funding and fair representation to which they are entitled.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to immediate injunctive relief directing the Bureau to spend money already appropriated and currently held in accounts of Defendants to (1) increase outreach and communications to no less than 2010 Census levels as directed by Congress (expenditure of an additional $127.8 million); (2) deploy a number of core enumerators whom Defendants are already hiring (but do not intend to use in the field) at no less than 2010 Census levels (expenditure of an additional $597.2 million); and (3) increase the Bureau's presence within Hard-to-Count communities by increasing the number of fixed Questionnaire Assistance Centers, field offices, and/or mobile questionnaire assistance units within those communities at levels commensurate to 2010 (expenditure of an additional $45.6 million).

Respectfully submitted,

/s/ Michael J. Wishnie

Rachel Brown, Law Student Intern
Lisa Chen, Law Student Intern
Daniel Ki, Law Student Intern
Nikita Lalwani, Law Student Intern
Wishcha (Geng) Ngarmboonanant, Law
Student Intern
Sommer Omar, Law Student Intern*
Laura Pietrantoni, Law Student Intern
Matthew Quallen, Law Student Intern*
Joshua Zoffer, Law Student Intern
Renee Burbank†
Michael J. Wishnie (MW1958)
Peter Gruber Rule of Law Clinic
Yale Law Schoolτ
127 Wall Street
New Haven, CT 06511
Tel: (203) 436-4780
michael.wishnie@ylsclinics.org

Jeremy M. Creelan
Susan J. Kohlmann
Seth H. Agata
Jacob D. Alderdice
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908
Tel: (212) 891-1600
jcreelan@jenner.com
skohlmann@jenner.com

---

* Motion for Leave to File Law Student Appearances forthcoming.
† Motion for admission pro hac vice forthcoming.
τ This motion does not purport to state the views of Yale Law School, if any.