K19YCENC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CENTER FOR POPULAR DEMOCRACY
     ACTION, et al.,
4
                      Plaintiffs,
5
                 v.                          19 CV 10917 (AKH)
6
     BUREAU OF THE CENCUS, et al.,
7
                      Defendants.
8
     ------------------------------x
9                                            New York, N.Y.
                                             January 9, 2020
10                                           2:45 p.m.

11   Before:

12                    HON. ALVIN K. HELLERSTEIN,

13                                           District Judge

14                           APPEARANCES

15   YALE LAW SCHOOL
     BY:  MICHAEL JOEL WISHNIE
16          -AND-
     JENNER & BLOCK LLP (NYC)
17        Attorneys for Plaintiffs
     BY:  JACOB D. ALDERDICE
18        JEREMY MICAH CREELAN

19   UNITED STATES ATTORNEY'S OFFICE
     SOUTHERN DISTRICT OF NEW YORK
20        Attorneys for Defendants
     BY:  LUCAS ESTLUND ISSACHAROFF
21

22

23

24

25

1          THE COURT:  This is Center for Popular Democracy

2    Action v. Bureau of the Census, 19 CV 10917.

3          Representing the plaintiff, we have Michael Wishnie.

4          MR. WISHNIE:  Good afternoon, your Honor.

5          THE COURT:  And Jacob Alderdice.

6          MR. ALDERDICE:  Good afternoon, your Honor.

7          THE COURT:  And Jeremy --

8          MR. CREELAN:  Creelan.  Good morning, your Honor.

9          THE COURT:  And both of you are from Jenner & Block.

10         MR. WISHNIE:  That's right, your Honor.

11         THE COURT:  And for the government, Lucas Issacharoff?

12         MR. ISSACHAROFF:  Yes, your Honor.  Thank you. good

13   afternoon.

14         THE COURT:  Good afternoon.

15         I think, Mr. Wishnie, you wanted to move pro hac vice

16   for the case some students.

17         MR. WISHNIE:  Yes, your Honor.  It's not technically

18   pro hac vice.

19         THE COURT:  No.  It's not.  I don't know what it is.

20         MR. WISHNIE:  It's under the Student Practice Rule of

21   the Southern District, your Honor.

22         THE COURT:  Who are the students?

23         MR. WISHNIE:  The students are students who are

24   enrolled in a clinic that I supervise.

25         Do you want me to recite their names for you?  They're

1    in the papers.

2             THE COURT:  Yes.

3             MR. WISHNIE:  The students are Daniel Ki; Rachel

4    Brown; Nikita Lalwani; Geng Ngarmboonanant; Laura Pietrantoni,

5    who is here today; and Josh Zoffer.

6             THE COURT:  What would their roles be?

7             MR. WISHNIE:  They would work under my supervision in

8    handling all aspects of the case authorized under the Southern

9    District's rule, which could include any aspect of the case,

10   provided that I am certainly present with them for any court

11   appearances, any discovery matters.

12            THE COURT:  What's the role, Mr. Alderdice, of Jenner

13   & Block?

14            MR. ALDERDICE:  Your Honor, Jenner & Block is

15   co-counsel with the Yale Law Clinic.  We are working as

16   co-counsel, both essentially having the same role.

17            THE COURT:  Who will be supervising the work done by

18   the students?

19            MR. WISHNIE:  That's me, your Honor.  There's a second

20   attorney who teaches the clinic with me and co-supervises it --

21   she may be on the phone -- Renne Burbank.  She will be moving

22   for admission pro hac vice.  But I am ultimately responsible,

23   your Honor.

24            THE COURT:  We were together -- what case was that?

25            MR. WISHNIE:  *Doe v. Hagenbeck*, the West Point matter,

K19YCENC

 1    your Honor.

 2            THE COURT:  The West Point case.  Yes.  And that

 3    worked out okay from the point of view of your students.

 4            MR. WISHNIE:  Yes, your Honor.

 5            THE COURT:  Not from the point of view of the result

 6    you wanted.

 7            MR. WISHNIE:  Well, the case is not over, your Honor.

 8    We're back in front of the Second Circuit.  They've tentatively

 9    calendared argument for the week of February 24.

10            THE COURT:  What's the issue?

11            MR. WISHNIE:  It's the appeal by plaintiff of the

12    statutory claims.  The prior appeal was just an interlocutory

13    appeal by the government on the constitutional claims, and the

14    statutory claims are now before the Second Circuit.

15            THE COURT:  Thank you.

16            Let's proceed here.  This is a motion by the

17    plaintiff.

18            Who is going to argue?

19            MR. ALDERDICE:  I will, your Honor.

20            THE COURT:  Go ahead.

21            MR. ALDERDICE:  Thank you, your Honor.

22            THE COURT:  Take the podium, please.

23            MR. ALDERDICE:  I'm sorry?

24            THE COURT:  Take the podium.

25            MR. ALDERDICE:  Yes, your Honor.  Sure.  Of course.

1    Good afternoon, your Honor.

2    THE COURT:  Good afternoon.

3    MR. ALDERDICE:  So we represent in this case the

4    plaintiff, the city of Newburgh, New York, and CPD Action.  And

5    both of those plaintiffs represent communities that are

6    presently at risk of imminent harm and are likely to suffer

7    that harm if this case does not proceed in an expedited manner.

8    Now, that harm is the result of actions that are taken

9    by defendants, and we have identified those five actions in our

10   complaint.  In this case, I'm happy to answer any questions you

11   have about our motion.

12   THE COURT:  Keep discussing it.

13   MR. ALDERDICE:  Sure.

14   THE COURT:  Why are you taking so long to come here?

15   MR. ALDERDICE:  So as to that, your Honor, it's

16   difficult to get into all of the details that lead a civil

17   society organization like CPD Action and a local government

18   like the city of Newburgh to bring a claim.

19   But I will say that at the moment, we brought this

20   claim because they are at imminent risk of this harm, and they

21   believe that they can obtain relief if this case proceeds in

22   this expedited manner.

23   THE COURT:  How should I deal with the fact that you

24   as counsel were representing plaintiffs in the Fourth Circuit

25   in the District of Maryland?

1    MR. ALDERDICE:  We don't think that that has really

2    any effect on this case.  Counsel, a national law firm like

3    Jenner & Block and a law clinic like the Yale Law Clinic,

4    represent different plaintiffs all the time.  And these are

5    separate plaintiffs with their own interests of avoiding

6    this --

7    THE COURT:  I would say there is an identity of

8    interest between the plaintiffs here and the plaintiffs in the

9    District of Maryland.

10    MR. ALDERDICE:  I'm sorry, your Honor?

11    THE COURT:  I would say that there's an identity of

12    interest between the plaintiffs in this case and the plaintiffs

13    in the District of Maryland.

14    MR. ALDERDICE:  We see them as different interests

15    between these plaintiffs.

16    THE COURT:  What are the differences?

17    MR. ALDERDICE:  The city of Newburgh, for example, has

18    different interests than Prince George's County in Maryland.

19    In the harm that they will suffer, the city of Newburgh is one

20    of the hardest to count areas in New York City.

21    THE COURT:  Isn't that the same with the case in the

22    District of Maryland?  You had a concern that not everybody

23    would be counted because people in poor areas tend not to be

24    counted and have a poor or a poorer response ratio than people

25    in more affluent areas.

1          MR. ALDERDICE:  Well, there are both different harms

2     to the plaintiffs here in Newburgh and in the communities that

3     CPD Action represents such as Brooklyn, New York, which is the

4     hardest to count area in New York City.  But there are also

5     different facts, if that's what your Honor is referring to.

6          In this action, we seek targeted relief, certain

7     actions in particular.  One is the defendants' refusal to

8     suspend an actual slashing of resources that are devoted to the

9     Partnership Program and community outreach to communities like

10    these in contravention of explicit directives from Congress.

11         The Fourth Circuit didn't deal with that issue, and

12    that is an issue that we would like to move on for preliminary

13    injunction in this case, along with the drastic and severe

14    reductions of enumerators and the defendants cutting the number

15    of field offices in half.

16         Those are the actions that we would like to seek

17    relief on in a more targeted fashion.  And that will be what we

18    intend to bring our preliminary injunction motion on promptly.

19    And that's what we raised in the letter with your Honor, to set

20    a schedule for that so that can move forward and we can obtain

21    relief.

22         That's also what we will seek -- we are seeking an

23    administrative record in an expedited fashion just seeking it

24    on those issues.  We believe that while the five decisions we

25    are targeting, we are still seeking the record on all of those,

1   but that as a way of further narrowing the record that can be

2   produced, that we would seek it on just those three issues that

3   we intend to bring our motion on.

4           THE COURT:  What are those three issues?

5           MR. ALDERDICE:  So those three issues -- one is the

6   defendants' decision to drastically reduce the number of total

7   census takers from the 2010 census to the 2020 census.  In the

8   2010 census, the defendants hired --

9           THE COURT:  Just give me the list.

10          What's two?

11          MR. ALDERDICE:  Two is the decision to cut the total

12  number of field offices in half.  And three is the decision to

13  slash the resources devoted to community outreach and

14  partnerships in express contravention of what Congress

15  requested.

16          Of course, we'll be briefing those issues --

17          THE COURT:  Slash money for the community outreach

18  offices?

19          MR. ALDERDICE:  Yes.  What's called the Partnership

20  and Communications Program which is essentially aimed at

21  community outreaching.  It is precisely one of the programs

22  that is aimed at decreasing the differential undercounts and

23  has shown success in the past.

24          THE COURT:  You're not interested in the decision to

25  replace in-field address canvassing with in-office address

1    canvassing?

2           MR. ALDERDICE:  We still do believe that that decision

3    is arbitrary and capricious and is unconstitutional.  That

4    decision has to do with the way the defendants assembled their

5    mailing list.

6           THE COURT:  But you're not proceeding on that?

7           MR. ALDERDICE:  We are not seeking emergency relief on

8    that issue.

9           THE COURT:  Similarly, efforts to count inhabitants in

10   units that appear vacant or nonexistent based unreliable

11   administrative records.

12          On you're not proceeding on that?

13          MR. ALDERDICE:  So our plans are still somewhat in

14   flux, and we will be making the motion that we believe is

15   narrowly tailored and most likely to obtain the necessary

16   relief that we need in the short term.

17          THE COURT:  So what happens to those two things?

18   Let's suppose I grant you the relief and you make a motion for

19   preliminary injunction.

20          What about these other two areas?  Are you withdrawing

21   them?

22          MR. ALDERDICE:  They would remain in the case, and we

23   believe that we can ultimately show that they are both

24   arbitrary and capricious.

25          THE COURT:  Without discovery?

1            MR. ALDERDICE:  No.  We intend there still to be

2      discovery.  But as to what we will show that there is a

3      likelihood of success on in our preliminary motion and show

4      that we can obtain preliminary relief on, it will be narrowly

5      tailored to those items that I identified.  But as the case

6      proceeds, we would still be able to make our case on those

7      other ones as well.

8            THE COURT:  And you want the administrative record.

9            MR. ALDERDICE:  That's right, your Honor.

10            THE COURT:  Is it your belief that there is a

11      collection of documents that constitutes the administrative

12      record?

13            MR. ALDERDICE:  We do think so, your Honor.  We're

14      willing to work with the government, to the extent we can meet

15      with the government, as we've already begun to do, to identify

16      the relevant documents.  To the extent that they have concerns

17      about burden, we're willing to work with the government.

18            THE COURT:  What does that mean?  Will the government

19      know what they have to produce if you just ask for the

20      administrative record with regard to, let's say, for the plan

21      to hire fewer enumerators than was the case for the previous

22      census?

23            MR. ALDERDICE:  Well, our understanding -- and the

24      government may be in the best position to answer this, but our

25      understanding is that those decisions were made within

1  particular divisions within the Census Bureau and that the

2  files will be located.  The files that relate to -- the

3  documents that relate to those decisions will be located in

4  within particular places.

5       THE COURT:  Is there any law that requires the

6  government to maintain records of everything influencing a

7  decision made by the Bureau of the Census?

8       MR. ALDERDICE:  I would think so, your Honor.  Yes.

9       THE COURT:  Do you know?

10       MR. ALDERDICE:  I'm sorry?

11       THE COURT:  Do you know?

12       MR. ALDERDICE:  I can't cite the particular law that

13  requires that, your Honor.

14       THE COURT:  Why do you think so then?

15       MR. ALDERDICE:  My understanding is that the

16  government will have retained the records that they used to

17  make the decisions.

18       THE COURT:  If there is no requirement on the part of

19  the government to collect records, how does the government know

20  whether it's satisfied its obligations or not?

21       MR. ALDERDICE:  We'll have to get back to you on that,

22  your Honor.

23       THE COURT:  No.  I want to know now.

24       MR. WISHNIE:  If I may, your Honor.  First, the

25  administrative record is narrower than records that may

1    influence the agency.  That was the word your Honor just used.

2    There is a well-established body of law under the

3    Administrative Procedure Act as to what constitutes the

4    administrative record.

5              In general terms -- and the government may have its

6    own view -- it's records that the decision-maker relied on in

7    making the decision.  So here, there's going to be a senior

8    person who makes the ultimate decision, we're going to cut the

9    enumerators by a third from last time around, even though the

10   population is bigger and all of our tests show people are less

11   responsive --

12             THE COURT:  Do you know the person who has made the

13   decision?

14             MR. WISHNIE:  No, I do not.  But that person will have

15   relied on a set of records in making that decision.  That's the

16   administrative record.

17             THE COURT:  It seems to me the first thing you need to

18   know is who made the decisions.

19             MR. WISHNIE:  We do.  The litigation is not against

20   that person.  It's officials in their official capacity.

21             THE COURT:  But that's the person you're going to take

22   a deposition of.

23             MR. WISHNIE:  Yes, your Honor, potentially.

24             I think I hear the government shifting behind me.

25             THE COURT:  No.  The government is not shifting.

1          MR. WISHNIE:  The government in other cases --

2          THE COURT:  Ignore the government, professor.

3          MR. WISHNIE:  What's that?

4          THE COURT:  Pay attention to me, not the government.

5          MR. WISHNIE:  Your Honor, the government has taken the

6    position in other APA cases in this district that depositions

7    are inappropriate; that all that is relevant and appropriate

8    for a court to order on an APA claim is the administrative

9    record.

10          Now, we do have a constitutional claim in this case on

11   which we will certainly seek discovery, including depositions.

12   That can be 30(b)(6) depositions that will get to who the

13   decision-maker is.

14          THE COURT:  The last thing I want to hear is the

15   timetable.  Let's say you prevail.

16          What's the last date that I can render a decision and

17   allow the government to implement the decision I make?  Let's

18   say I rule for you.

19          MR. WISHNIE:  Yes, your Honor.  Your Honor, the last

20   date of census operations in the field, as I understand it, is

21   the end of August.  Some parts of the three items that my

22   colleague has identified we believe are immediately

23   implementable.  We have discussed a schedule with the

24   government.  I'm prepared to share it with you, if you'd like.

25          THE COURT:  I would.

1           MR. WISHNIE:  We would propose -- plaintiffs would

2    propose -- that plaintiffs move for a preliminary injunction by

3    Friday of next week, January 17.  Defendants would respond to

4    the preliminary injunction motion and move to dismiss in a

5    consolidated filing by February 7.  Plaintiffs would reply on

6    their motion for preliminary injunction and respond to the

7    government's motion to dismiss together by February 21.  And

8    the government would reply on its motion to dismiss by

9    February 28.

10           THE COURT:  Can you dispense with one of the four

11    rounds and make it three rounds so that both the government's

12    motion to dismiss and your motion for preliminary injunction

13    will be due January 17.  All responses to both will be due

14    February 7, and the reply will be February 21.  And that will

15    end the briefing.

16           MR. WISHNIE:  That will be very good from plaintiffs'

17    perspective, your Honor.  Yes.

18           THE COURT:  That's what I prefer.

19           If you have to make motions by January 17, when do you

20    need expedited production by?

21           MR. WISHNIE:  Well, we would like it as soon as

22    possible of course.  Let me be a little transparent in our

23    thinking on this.  We think we can move for preliminary

24    injunction right now because the standard is likelihood of

25    success and the Census Bureau has made some number of records

1    publicly available.

2         For a final judgment, we will need the actual

3    administrative record, whether it's on summary judgment or

4    trial down the line.  But for the preliminary injunction, we're

5    prepared to move right away.

6         We do think that if the government can produce the

7    administrative record limited to the first three items by

8    Monday, then we can incorporate that into the preliminary

9    injunction motion.

10        But we're prepared to make our motion, even if we have

11   nothing on the administrative record, by Friday, the 17th.

12             THE COURT:  Let me come back to you folks.

13             Mr. Issacharoff, let me have your take on all of this.

14             MR. ISSACHAROFF:  Thank you, your Honor.

15             I'll start by addressing the schedule that plaintiffs

16   proposed and that your Honor suggested.

17             To be perfectly frank, filing a motion to dismiss by

18   next Friday would be an extremely heavy lift for the

19   government.  Plaintiffs' counsel, as your Honor noted, have

20   litigated these same issues extensively.

21             THE COURT:  What's your suggested date?

22             MR. ISSACHAROFF:  Our current deadline to respond to

23   the complaint was February 7.  We understand if your Honor

24   wants to move that up somewhat, but I think perhaps January 31

25   to file a motion to dismiss.  I think the reason we had

K19YCENC

1    proposed --

2              THE COURT:  Give me your schedule.

3              January 31 to file the motion to dismiss, and the

4    motion for preliminary injunction will be filed simultaneously.

5              MR. ISSACHAROFF:  If your Honor wants them filed

6    simultaneously, then I would propose January 31 for the

7    motions, February 21 for the oppositions, and March 5 or 6

8    would be how two weeks would work out for the replies.  But I

9    don't have a calendar right in front of me.

10             THE COURT:  March 4.

11             MR. ISSACHAROFF:  March 4.  Okay.

12             THE COURT:  So January 31, February 21, and March 4.

13             Let's suppose I rule for the government.

14             MR. ISSACHAROFF:  Yes, sir.

15             THE COURT:  That will be the end of the case, except

16    for appeals.

17             MR. ISSACHAROFF:  If your Honor granted the motion to

18    dismiss, yes.  That would be the end of the case, except for

19    appeals.

20             THE COURT:  Let's suppose I rule for the plaintiff.

21             MR. ISSACHAROFF:  Yes, your Honor.

22             THE COURT:  You would appeal.

23             MR. ISSACHAROFF:  Yes.

24             THE COURT:  And then if you lost in the Second

25    Circuit, you would petition for cert.

1      MR. ISSACHAROFF:  That would be run through the

2  Solicitor General's Office, but that would be my overwhelming

3  guess as to what would happen.

4      THE COURT:  When is the last date that there can be

5  finality for purposes of implementing a final decree in favor

6  of the plaintiff?

7      MR. ISSACHAROFF:  Your Honor, I'm not in a position to

8  state that at this moment, in part, because the nature of

9  plaintiffs' requested relief is still somewhat nebulous.

10      Plaintiffs have stated that they're not intending to

11  move for a preliminary injunction on issues related to the

12  canvassing phase, for example.  But if they were ultimately to

13  obtain final relief as to canvassing, that would require the

14  reopening of a process that has largely concluded at this

15  point.

16      Similarly, there's a lag time for open area census

17  offices, hiring additional enumerators, increasing partnership

18  programs.  I'm not in a position to state what the drop-dead

19  date would be.  But it is hard for me to imagine a course of

20  this litigation that does not require your Honor to, in some

21  sense, enjoin the census itself.

22      THE COURT:  I wouldn't want to do that.

23      What you're telling me is that the schedule that you

24  have suggested is too leisurely.  I have to conduct this case

25  so that both sides can get a decision and appeal it.

1      That timetable must be practical because if the

2 plaintiffs win, they need to have some substance to their

3 victory.  And that has to express itself in a greater number of

4 people making counts; in a large number of field offices

5 evaluating the counts; in having various kinds of ways of

6 increasing participation, which is what I think the community

7 outreach and partnership programs are intended to bring about.

8      MR. ISSACHAROFF:  As your Honor noted at the outset --

9      THE COURT:  I would rule against your timetable if I

10 can't get a clear answer.

11      MR. ISSACHAROFF:  I don't think there is a briefing

12 timetable that's going to allow the case to fully play out

13 without requiring any adjustment of the schedule of the census.

14      THE COURT:  Let's say that the motion is presented to

15 me by March 4, and let's say that I'm able to decide by

16 March 20.

17      What would happen then?  Can you go directly to the

18 United States Supreme Court as happened in Judge Furman's

19 census decisions?

20      MR. ISSACHAROFF:  Again, that is a decision that would

21 have to be made by the Solicitor General's Office that I don't

22 have the authority to make.  But it's certainly possible that

23 such an application could be made.  It would also be within the

24 discretion of the Supreme Court, of course, to allow any such

25 expedited certiorari.

```
 1              THE COURT:  It seems to me, Mr. Wishnie, that I have

 2    to deal with all aspects of the case at the same time and that

 3    production must occur sufficiently before January 31 so that

 4    you can make your motions.

 5              MR. ISSACHAROFF:  Your Honor, I would push back in two

 6    regards:  First, as plaintiffs' counsel acknowledged, they do

 7    not require any additional production in order to make their

 8    motions.

 9              In large part, that's because of the extensive

10    material that's already available in the public record.  I

11    would note that that includes the operational plan itself --

12              THE COURT:  Did you make any production in the

13    District of Maryland case?

14              MR. ISSACHAROFF:  Yes, your Honor.

15              THE COURT:  Wouldn't the same production satisfy this

16    case?

17              MR. ISSACHAROFF:  That would have to be addressed

18    through plaintiffs, but we are preparing to reproduce the same

19    materials that were produced in the Maryland litigation.

20              THE COURT:  Why can't I order that all production must

21    be made by January 17?

22              MR. ISSACHAROFF:  In part, that's because it's not

23    clear what the administrative record would consist of.  What

24    plaintiffs' counsel stated is it's the records that the

25    decision-maker relied on in making the decision.  And here I'm
```

1  afraid it intercepts somewhat with the merits of plaintiffs'

2  challenge.

3          In an ordinary case, you if were talking about, say,

4  whether to grant a permit or deny a permit, if you were talking

5  about an administrative adjudication of some sort, there would

6  be a discrete, obvious agency action with a record associated

7  with it.

8          I'm not saying that compiling the administrative

9  record is easy in any case because colleagues in my office

10  would certainly disagree, but there is a discrete agency

11  action.

12          As the District of Maryland, as the Fourth Circuit

13  unanimously noted here, there is no such discrete action.

14  These are not three or five or six discrete decisions.  They

15  are trying to litigate the entire operation of the 2020 census.

16  Any decision in this case is an iterative process over years.

17          If I may just step back to explain how we got to this

18  point.  After the 2010 census which cost $12.3 billion and was

19  the most expensive on record, Congress directed the Bureau of

20  the Census in 2011 to examine ways to make the census more cost

21  effective and utilize modern technology.

22          There was then a three-year period from 2012 through

23  2015 in which the Census Bureau extensively tested and

24  investigated the possibilities of utilizing modern technology

25  and streamlining the census to achieve better results at a

1    reduced cost.

2             In 2015, the Census Bureau released version 1.0 of its

3    operational plan.  We're now debating version 4.0 of the

4    operational plan.  So you're talking about a process that

5    involves the entire Census Bureau or at least three, as

6    plaintiffs suggest, three of its six directories, over a period

7    of a decade, potentially involving a comparison to the

8    preparations in the decision-making leading up to the 2010

9    census which would stretch back as far as 2000 or 2001.

10            THE COURT:  The decision-maker would not be probably

11   immersing himself into all the preliminary decisions that were

12   made.  He would probably rely on conclusions reached from these

13   studies so the documents necessary would be much reduced.

14            MR. ISSACHAROFF:  That may be the case, your Honor.

15   But then I would point to how much of that information is

16   already public.  There have been operational plans and detailed

17   operational plans --

18            THE COURT:  It's all made public.  It's easy for you.

19   So that's not a good excuse.

20            MR. ISSACHAROFF:  Yes, but what I'm pointing out, your

21   Honor, is that the material necessary to litigate at least the

22   preliminary relief sought here is already available to

23   plaintiffs as they acknowledge.

24            I would also point out that plaintiffs obtained

25   over -- I'm sorry.  The Yale Law School clinic obtained over

1  17,000 pages from the Department of Commerce and the Bureau of

2  the Census in FOIA litigation that covers many of the same

3  questions at issue here. There is congressional testimony; IG

4  reports; periodic program management reviews; monthly status

5  reports; dozens of memoranda, 30 in 2019 alone.

6  To say that there is an administrative record that we

7  can easily identify and produce in a period of three weeks, as

8  your Honor may be contemplating, assumes that there is a

9  decision, there is unagency action that is under review here.

10  That's not the case. There is a comprehensive set of decisions

11  in terms of how to implement and manage --

12  THE COURT: How do you deal with that, Mr. Wishnie?

13  MR. WISHNIE: Thank you, your Honor.

14  First of all, if the government would stipulate that

15  the administrative record for APA purposes is the public

16  records plus what was produced in Maryland which they would

17  reproduce to the plaintiffs here, of course we would accept

18  that.

19  If what they're saying is that there are other records

20  that the decision-maker relied on on these three discrete

21  actions, apart from what is public and already produced in

22  Maryland, then that is what we would seek. I disagree very

23  much with the kind of it's really hard and it's really complex

24  story here.

25  Taking just the first, the plan to reduce the

1   enumerators from about 600,000 in 2010 to 400,000 this time

2   around, despite a larger population, and the Bureau's own

3   studies showing greater distrust of government now than last

4   time around -- someone made that decision.  They made it fairly

5   recently.

6          They didn't make that decision in 2001.  And that

7   person relied on briefing from an adviser, a study,

8   recommendation from the agency.  That's the administrative

9   record.  We think that it's appropriate.

10          I take your Honor's point that rather than the plan I

11  arrived here with, which was a preliminary injunction schedule

12  and then a later schedule to take care of everything else in

13  the case, I understand your Honor's instinct to try to do it

14  all now and get it done for the reasons you said.

15          THE COURT:  Otherwise, this will stretch out too far

16  and there won't be a good record for appeal.  No one's going to

17  rest with my decision.  There's going to be another decision

18  after this.

19          Supposing the government identifies the decision-maker

20  and produces all the documents that influenced the decision of

21  the decision-maker.

22          Wouldn't that satisfy your needs?

23          MR. WISHNIE:  Yes, your Honor.

24          THE COURT:  Can you do that, Mr. Issacharoff?

25          MR. ISSACHAROFF:  I would have to confer with the

1    Bureau of the Census and the Commerce Department.

2              THE COURT:  I'm going to make a ruling now.  You

3    better tell me.

4              MR. ISSACHAROFF:  I think it would be exceedingly

5    difficult, given the breadth of the decisions at issue here and

6    given that they are not classic APA discrete agency actions.

7              Your Honor, if I may reiterate.  I don't think

8    plaintiffs have responded to the question about whether it's

9    realistic to think that there could be any outcome to this

10   litigation that would not require moderating the schedule of

11   the 2020 census.

12             If your Honor were to rule the day after briefing is

13   completed, whether on February 21 as plaintiffs had proposed or

14   March 4 as I had suggested, you would be talking about, if

15   your Honor granted the motion, potentially an order that would

16   say something along the lines of the Bureau of the Census must

17   open 52 additional area offices and hire 200,000 additional

18   enumerators to conduct the census.

19             That can't happen in a month by the start of the

20   April 1 census, not to mention the partnership programs,

21   additional canvassing, if that were part of it, or anything

22   else.

23             MR. WISHNIE:  Your Honor, if I may, just on the first

24   point still, the enumerators as illustrative.  That is not a

25   fair characterization of the relief sought.

 1            The Bureau is in the process of hiring 400,000

 2     enumerators, door knockers, who follow up when people don't

 3     respond.  But they have said they will rely actually on only

 4     about 250,000 of those 400,000 they call core enumerators.

 5            The relief on our first point would simply be the

 6     other 150,000 people who you've hired into federal

 7     employment -- you've interviewed them.  You've screened them.

 8     You've hired them.  But you do not plan to deploy them because

 9     you plan to rely on only 250,000 of the 400,000.  Use the other

10     people.

11            Where's the money?  It's sitting in your piggy bank

12     because we're talking here in this case exclusively about the

13     expenditure of funds that have already been appropriated by

14     Congress that are sitting unspent with the Commerce Department.

15            So the relief on the enumerators is easy.  Deploy the

16     people you've already hired with the money Congress has already

17     appropriated, full stop.  That doesn't require postponing the

18     entire 2020 census or reopening operations from last year.  To

19     the contrary.  It simply says use the people you've already

20     hired with the money Congress has already given you.

21            MR. ISSACHAROFF:  If I may briefly respond, your

22     Honor.

23            THE COURT:  Yes.

24            MR. ISSACHAROFF:  If I may quote the Fourth Circuit's

25     opinion in the NAACP litigation:  "Contrary to their position

1  on appeal, the plaintiffs do not actually challenge multiple

2  discrete decisions made by the Census Bureau.

3      "Instead, as pleaded, the various design choices being

4  challenged expressly are tied to one another.  Setting aside

5  one or more of these choices necessarily would impact the

6  efficacy of the others and inevitably would lead to Court

7  involvement and hands-on management of the Census Bureau's

8  operations.  This is precisely the result that the discreteness

9  requirement of the APA is designed to avoid.

10     "For these reasons, we hold that the plaintiffs have

11  failed to identify any final agency actions subject to judicial

12  review under the APA."

13     We're talking about litigation that could have been

14  brought either on January 1 of 2019 or on February 2 of 2019

15  that plaintiff sat on for ten months while the plaintiffs'

16  counsel were pursuing other parallel litigation; that now on

17  the eve of the census, they want this Court to instruct the

18  Census Bureau, in an incredibly detailed way, as to how to

19  carry out a census that is effectively in operation and set to

20  begin its full active enumeration phase on April 1.  This is

21  not what the APA is for, your Honor.

22     THE COURT:  I am not in a position at this point to

23  make any rulings with regard to your comments.  But I am in a

24  position to make a ruling that plaintiff is entitled to advance

25  their cases to the point where I can make such a ruling.

1      In that connection, I will require the government to
2  identify by January 17, 2020, the decision-makers on each and
3  all of the five points that are in litigation and by January 24
4  to produce the administrative record that underlay those
5  decisions.
6      I then adopt the schedule given to me by
7  Mr. Issacharoff where all motions for preliminary injunction or
8  dismissal must be filed by January 31.  All responses by
9  February 21.  All replies by March 4.
10      I will endeavor to decide the case by March 20 and
11  probably schedule oral argument before that.  Let's say
12  March 18 at 2:30.
13      MR. WISHNIE:  Your Honor, on March 18, do you
14  anticipate wanting witnesses?
15      THE COURT:  No.  I won't be hearing witnesses.
16      MR. WISHNIE:  Thank you.
17      THE COURT:  Unless I change my mind from reading the
18  papers, but I don't see the need for witnesses at this point.
19      Any questions from anybody?
20      MR. WISHNIE:  Your Honor, thank you for the schedule.
21  Plaintiffs of course are very amenable to it and will comply
22  with it.
23      Your Honor mentioned depositions earlier, and I said
24  that was appropriate on the constitutional claim and not on the
25  APA claim.

1      I wonder whether your Honor would permit a 30(b)(6)

2   deposition on these five decisions.

3      THE COURT:  I don't think there's time.  I don't think

4   there's time.  If I have to make a decision on dismissal and

5   preliminary injunction by March 20, the schedule does not

6   permit depositions before then.  Then we'll see where we go

7   from there.

8      But if I issue a preliminary injunction which you

9   want, Mr. Issacharoff is going to appeal.  Whether to the

10  Second Circuit or the Supreme Court, I don't know.  We can

11  continue with other parts of the case after that.  But I'll

12  have to make that decision on March 20.

13     MR. WISHNIE:  Thank you, your Honor.

14     THE COURT:  Anything further?

15     MR. ISSACHAROFF:  Nothing further, your Honor.

16     THE COURT:  Thank you.

17     MR. WISHNIE:  Your Honor, to clarify the very first

18  exchange we had, your Honor.

19     Is the Court prepared to make an order on the

20  students' appearances?  Or is that still something you're

21  thinking about?

22     THE COURT:  You made a motion.

23     MR. WISHNIE:  Yes.

24     THE COURT:  I granted it.

25     MR. WISHNIE:  Thank you, your Honor.